**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:
Clifford W. Taylor

Justices:
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman

FILED JULY 28, 2006

DIANE CAMERON AND JAMES CAMERON,
Co-Guardians of the Estate of Daniel Cameron,

    Plaintiffs-Appellants,

v

No. 127018

AUTO CLUB INSURANCE ASSOCIATION,

    Defendant-Appellee.

_____

BEFORE THE ENTIRE BENCH

TAYLOR, C.J.

We granted leave in this case to determine whether the minority/insanity tolling provision of the Revised Judicature Act (RJA), MCL 600.5851(1), applies to toll the "one-year-back rule" in MCL 500.3145(1) of the no-fault automobile insurance act.[1] The Court of Appeals, reversing the trial court's denial of defendant's motion for summary disposition, held that it does not, but further

---

[1] This rule limits the amount of personal protection insurance (PIP) benefits recoverable to those incurred within one year before the action was commenced.

concluded that the tolling provision at issue does not apply to the applicable statute of limitations for no-fault actions that is also set out in MCL 500.3145(1).

We affirm the Court of Appeals determination that defendant is entitled to summary disposition, but on narrower grounds. To decide this matter, the Court of Appeals only needed to address whether MCL 600.5851(1) tolls the one-year-back provision in MCL 500.3145(1). Because we conclude that MCL 600.5851(1) cannot toll the one-year-back rule, and all damages sought here were for more than one year back, no damages could be recovered and that disposes of this matter. Accordingly, it was dicta for the Court of Appeals to address the effect of MCL 600.5851(1) on the statute of limitations in MCL 500.3145(1) and we vacate that portion of its ruling while affirming its conclusion that defendant is entitled to summary disposition in this case.

## I. FACTS

Daniel Cameron, a minor, suffered a closed head injury resulting in a cognitive disorder when an automobile struck his bicycle in 1996. At the time of the accident, Daniel's parents maintained a no-fault automobile insurance policy with defendant Auto Club Insurance Association under which Daniel was eligible for coverage. In 2002, when Daniel was 16 years old, his parents filed suit on his behalf seeking PIP benefits for attendant care rendered to Daniel from August 1996 to August 1999.

Defendant moved for summary disposition, arguing that plaintiffs'[2] claim was barred by the one-year-back rule in MCL 500.3145(1). The circuit court denied defendant's motion and, instead, granted summary disposition in favor of plaintiffs. Thereafter, the circuit court entered a judgment in plaintiffs' favor in the amount of $182,500, an amount stipulated by the parties.

Defendant appealed to the Court of Appeals, which reversed.[3] The Court of Appeals held that tolling under MCL 600.5851(1) does not affect the date for bringing an action or limit the one-year-back rule of MCL 500.3145(1).[4] The Court therefore concluded that the circuit court had improperly denied defendant's motion for summary disposition.

This Court granted plaintiffs' application for leave to appeal.[5]

---

[2] Although Daniel's parents filed suit on his behalf, we refer to them, rather than Daniel, as "plaintiffs" for ease of reference.

[3] 263 Mich App 95; 687 NW2d 354 (2004).

[4] In holding this way, the Court noted that one aspect of the legislative amendments of MCL 600.5851 in 1993 PA 78 was to change the wording of the minority/insanity tolling provision in subsection 1 from stating that it applies to a person entitled to "bring *an action*" to stating that it applies to a person entitled to "bring *an action under this act*." (Emphasis added.) On the basis of this change, the panel concluded that the minority/insanity tolling provision in MCL 600.5851(1) does not apply to causes of action arising after October 1, 1993, the effective date of 1993 PA 78, for which the applicable statute of limitations is not provided in the RJA.

[5] 472 Mich 899 (2005).

## II. STANDARD OF REVIEW

We review de novo a trial court's grant or denial of a motion for summary disposition.[6] Questions of statutory interpretation are also reviewed de novo.[7] As always, our primary goal when interpreting statutes is to discern the intent of the Legislature by focusing on the best indicator of that intent, the language the Legislature adopted in the statute.[8]

## III. ANALYSIS

As stated above, plaintiffs filed suit in 2002, seeking no-fault automobile insurance benefits for attendant care rendered to Daniel from August 1996 to August 1999. Defendant asserts that this action is barred by MCL 500.3145(1), which provides in relevant part:

> An action for recovery of personal protection insurance benefits payable under this chapter for accidental bodily injury may not be commenced later than 1 year after the date of the accident causing the injury unless written notice of injury as provided herein has been given to the insurer within 1 year after the accident or unless the insurer has previously made a payment of personal protection insurance benefits for the injury. If the notice has been given or a payment has been made, the action may be commenced at any time within 1 year after the most recent allowable expense, work loss or survivor's loss has been incurred. *However, the claimant may not recover benefits for any portion of the loss incurred more than 1 year before the date on which the action was commenced.* [Emphasis added.]

---

[6] *Nastal v Henderson & Assoc Investigations, Inc,* 471 Mich 712, 720; 691 NW2d 1 (2005).

[7] *Id.*

[8] *Id.*; *Kreiner v Fischer,* 471 Mich 109, 129; 683 NW2d 611 (2004).

As we recently reiterated in *Devillers v Auto Club Ins Ass'n,*[9] MCL 500.3145(1) contains two limitations on the time for commencing an action and one limitation on the period for which benefits may be recovered:

> "(1) An action for personal protection insurance [PIP] benefits must be commenced not later than one year after the date of accident, *unless* the insured gives written notice of injury or the insurer previously paid [PIP] benefits for the injury.

> "(2) *If* notice has been given or payment has been made, the action may be commenced at any time within one year after the most recent loss was incurred.

> "(3) Recovery is limited to losses incurred during the one year preceding commencement of the action."[10]

Thus, an action for PIP benefits must be commenced within a year of the accident unless the insured gives written notice of injury or previously received PIP benefits from the insurer. If notice was given or payment was made, the action can be commenced within one year of the most recent loss. Recovery, however, is limited to losses incurred during the year before the filing of the action.

In the present case, although plaintiffs filed their complaint in 2002, more than one year after the date of the accident in 1996, defendant does not dispute that it either received written notice of injury or previously paid benefits and that plaintiffs commenced their action within one year after the most recent loss was

---

[9] 473 Mich 562, 574; 702 NW2d 539 (2005).

incurred. Thus, defendant's sole assertion is that the one-year-back rule bars plaintiffs' claim because the period for which the plaintiffs seek recovery for their losses is August 1996 to August 1999. This, of course, is a period more than one year before the 2002 commencement date of their action. Thus, defendant argues, and the Court of Appeals agreed, no damages are recoverable

In response, plaintiffs contend that the minority/insanity tolling provision in MCL 600.5851(1) applies to toll the one-year-back rule with regard to damages in MCL 500.3145(1) and, as a result, the losses incurred between August 1996 and August 1999 are recoverable. We disagree.

MCL 600.5851(1) provides in relevant part:

> [I]f the person first entitled to make an entry or bring an action under this act is under 18 years of age or insane at the time the claim accrues, the person or those claiming under the person shall have 1 year after the disability is removed through death or otherwise, to make the entry or bring the action although the period of limitations has run.

By its unambiguous terms, MCL 600.5851(1) concerns when a minor or person suffering from insanity may "make the entry or bring the action." It does not pertain to the damages recoverable once an action has been brought. MCL 600.5851(1) then is irrelevant to the damages-limiting one-year-back provision of MCL 500.3145(1). Thus, to be clear, the minority/insanity tolling provision in

_____
(…continued)
[10] *Devillers, supra* at 574, quoting *Welton v Carriers Ins Co,* 421 Mich 571, 576; 365 NW2d 170 (1985), overruled on other grounds in *Devillers, supra*.

6

MCL 600.5851(1) does not operate to toll the one-year-back rule of MCL 500.3145(1).

We note that in *Geiger v Detroit Automobile Inter-Insurance Exch*,[11] our Court of Appeals reached the opposite conclusion and held that the minority/insanity provision in MCL 600.5851(1) does toll the one-year-back rule in MCL 500.3145(1). In reaching this conclusion the Court of Appeals, looking behind the language of the statute and focusing on its understanding of the Legislature's purported intent, determined that the legislative purpose behind the minority/insanity tolling provision for periods of limitations was to preserve not only a person's cause of action during the period of disability but also the person's damage claims. It opined that to not read the statute in this fashion would "severely limit the utility" of the minority/insanity tolling provision. The Court then concluded that, "[i]n order to advance the policy of RJA § 5851," the minority/insanity tolling provision applies to prevent the capping of damages under the one-year-back rule of MCL 500.3145(1).[12]

We believe this ruling was erroneous for the most uncomplicated reason; namely, that we must assume that the thing the Legislature wants is best understood by reading what it said. Because what was said in MCL 500.3145(1)

---

[11] 114 Mich App 283; 318 NW2d 833 (1982).

[12] *Id.* at 291.

and MCL 600.5851(1) is clear, no less clear is the policy. Damages are only allowed for one year back from the date the lawsuit is filed. We are enforcing the statutes as written.[13] While some may question the wisdom of the Legislature's capping damages in this fashion, it is unquestionably a power that the Legislature has under our Constitution.[14] Thus, because *Geiger's* conclusion that the minority/insanity tolling provision applies to extend the one-year-back rule is contrary to what the Legislature clearly directed in MCL 500.3145(1) and MCL 600.5851(1), *Geiger* is overruled.

Because we conclude that the minority/insanity tolling provision in MCL 600.5851(1) does not apply to the one-year-back rule in MCL 500.3145(1), we find it unnecessary in this case to reach the broader question whether the legislative amendments in 1993 PA 78 limit the applicability of the minority/insanity tolling provision to causes of action for which the applicable statute of limitations is set forth in the RJA. Because the Court of Appeals unnecessarily addressed this broader issue, its holding in this regard is vacated.

IV. RESPONSE TO JUSTICES CAVANAGH AND KELLY

---

[13] *Devillers, supra* at 588-589; *Warda v Flushing City Council,* 472 Mich 326, 340; 696 NW2d 671 (2005).

[14] *Phillips v Mirac, Inc,* 470 Mich 415, 431-438; 685 NW2d 174 (2004).

8

Justices Cavanagh and Kelly choose to attack our law-driven conclusion by proffering reasons why they think the one-year back rule *should* be tolled for minors and insane persons. What they should be seen as arguing is that all the disciplines that judges, lawyers, and even lay people use for giving meaning to documents and distinguishing in a principled fashion between potentially conflicting instruments are to be disregarded and instead we are to raise our eyes from the tedious page, weigh who is the most compelling litigant, and "effect legislative intent." This begs the question, to which they have no answer, of why the words the Legislature used do not do that better than their efforts to find the "real intent." Moreover, with a system of mandatory automobile no-fault insurance such as the Legislature has enacted, it just may be, because of the economies required to make it work, that the Legislature's "real intent" was to set up strict rules that can unfortunately, but unavoidably if you want no-fault insurance, produce some sad outcomes.

If the statute has provisions that are harsh, they undoubtedly reflect the compromises that were hammered out in the Legislature at the time mandatory coverage automobile no-fault insurance was enacted by the Michigan Legislature. Votes were cast for the statute by legislators on the basis that the compromises would be honored. It was for them, the legislators, not us, the judges, to weigh the "competing interests" and "chose the result" to use Justice Cavanagh's

descriptions.[15]  In doing this we do not "ignore[] the interests of the insured,"[16] just as we are not "protecting insurers."[17] Nor should a court that looks to the statute and follows it be charged with ignoring "weighty public policy."[18] Moreover, a court is not "refusing to acknowledge that there is a conflict" between two statutes[19] to refuse to be complicit in conjuring up an imaginary conflict. Similarly, it is not a judge's task to read two very different statutes, one about the tolling of claims and another about allowed damages in an insurance action, and assert that they are unharmonious or that to understand them requires a special "frame of reference."[20] Reproaches of this sort by Justices Cavanagh and Kelly because we refuse to follow their lead, betray a profound misunderstanding of the judicial and legislative roles.  It is the legislators who establish the statutory law because the legislative power is exclusively theirs.[21] We cannot revise, amend, deconstruct, or ignore their product and still be true to our responsibilities that give our branch only the judicial power.[22] By what theory can we not recognize

---

[15] *Post* at 11.

[16] *Id.*

[17] *Id.*

[18] *Id.* at 12.

[19] *Id.* at 13.

[20] *Id.* at 13 n 10.

[21] Const 1963, art 4, § 1.

[22] Const 1963, art 6, § 1.

these undeniable constitutional truths? The only one is that we have the raw power, because we rule after they have enacted, to refuse to honor the bargain they struck. This is an indefensible position whose illegitimacy was classically outlined by Chief Justice Marshall in the celebrated case of *Marbury v Madison,* 5 US (1 Cranch) 137, 177; 2 L Ed 60 (1803), which has been the lodestar for generations of judges in questions of statutory construction: ours is to declare what the law is, not what it ought to be.

As an additional argument, Justices Cavanagh and Kelly argue that the result reached by following the statutory language is "absurd" and contend, effectively, that we should rewrite the statutes in order to reach a result that better comports with their own personal policy preferences or, as they would have to describe it, what the Legislature must have really intended regardless of what it said. While they and Justice Weaver urge us to revisit *People v McIntire,* 461 Mich 147; 599 NW2d 102 (1999), there is no reason for us to do so in this case. Whatever the wisdom of the rule, it would be dicta to discuss it here because, as Justice Markman has aptly pointed out in his concurrence, the "absurd results" doctrine does not implicate the decision in this case because what was done by the Legislature was not absurd. The reason is that there are several conceivable explanations, as we have pointed out, why the Legislature could have intended the result the plain language of the statute requires. Thus, the result here is not absurd when properly understood and no discussion of the absurd results rule is germane.

What this all comes down to is that the proponents of the dissents' positions who have petitioned this Court for assistance are simply in the wrong place. They should go to the Legislature. There the increased premium costs to the drivers of this state occasioned by the revisions they seek for this mandatory insurance can be measured against the important goals of, among other things, affordability of this mandatory insurance. We have neither the tools nor the authority to strike that balance and we recognize it. It may be that the proponents of change will prevail in the Legislature or it may be that in the Legislature's wisdom the benefits will not justify the burden of increased premiums and potentially more uninsured drivers that will be occasioned by the changes sought. But, again, it must be emphasized, no one on this Court, or any other, has warrant to impose our view on the balance striking and make it law. The Legislature and the Legislature alone has that power. That it has struck this balance in the past in a way that strikes the dissents as "inexplicable and unsupported"[23] or "absurd"[24] is, as we have explained here, and before in these types of cases, irrelevant.

In conclusion, as judges, we have read the statutes at issue without a thumb on the scale. We are willing to enforce what the Legislature has enacted. It is just plain wrong to say or imply that we are indifferent or hostile to the rights of the

---

[23] *Post* at 18.

[24] *Post* at 20 n 12.

12

disabled. We are not. We are recognizing the rights that the lawgivers gave them, and no Court should do more or less.

## V. RESPONSE TO JUSTICE WEAVER

Justice Weaver has argued in her dissent the inapplicability of the one-year-back rule to this case. We believe her argument is flawed, as we will discuss, but the more significant problem with it is that, even if it is correct, it cannot apply to these litigants. She argues that the one-year-back rule limits the amount of damages that can be recovered in no-fault cases *only* if the plaintiff is able to bring its action beyond one year from the date of the accident because it provided notice or was previously paid benefits as set forth in MCL 500.3145(1), and that the one-year-back rule *does not* apply if the time for bringing the action was extended by application of the minority/insanity tolling provision in MCL 600.5851(1). From this starting point, she then asserts that the one-year-back rule does not apply in this case because plaintiffs relied on the minority/insanity tolling provision in MCL 600.5851(1) to extend the one-year period of limitations for bringing the action. The record does not seem to support Justice Weaver's assertion, however, that plaintiffs relied on the minority/insanity tolling provision in MCL 600.5851(1) to toll the one-year period of limitations in MCL 500.3145(1) that accrued on the date of the accident rather than merely taking advantage of that statute's other one-year period of limitations that began on the date of the most recent allowable expense. This is because the record indicates that defendant admitted that plaintiffs' complaint was timely filed in accordance with the limitations period of MCL 500.3145(1) that accrued on the date of the most recent

allowable expense because defendant had received notice or previously paid benefits.[25] Thus, it appears from the record that plaintiffs only attempted to rely on the minority/insanity tolling provision in MCL 600.5851(1) to extend the one-year-back rule, not the time period for bringing their claim.

But even if the record could be interpreted to support Justice Weaver's contention that plaintiffs relied on the minority/insanity tolling provision in MCL 600.5851(1) to extend the period for bringing their action, her conclusion that the one-year-back rule only applies in cases where plaintiffs take advantage of the later period of limitations that begins at the time of the most recent allowable expense is incorrect. This Court has consistently interpreted MCL 500.3145(1) as containing three distinct periods of limitations: two limitations on the time for filing suit (one provided in the first half of the first sentence of MCL 500.3145[1] that starts on the date of the accident, and a second, later one provided in the second sentence of MCL 500.3145[1] that starts at the time of the most recent allowable expense if the insured has given notice of injury or the insured has previously paid benefits), and one limitation on the period for which benefits may be recovered (the one-year-back rule contained in the third sentence of MCL

---

[25] Defendant stated in its affirmative defenses that "Since *notice was given, or payment has been previously made*, Plaintiffs may not recover benefits for any alleged expenses incurred more than one (1) year before the date on which the action was commenced, pursuant to MCL 500.3145(1)." (Emphasis added.)

500.3145[1]).[26]  With only minimal explanation, Justice Weaver argues that we should overrule this precedent,[27]  contending that only the first half of the first sentence of MCL 500.3145(1) is a period of limitations, while the remainder of the first sentence is a tolling provision and the second and third sentences of MCL 500.3145(1) are merely "details" of how it is to be applied.[28]

The language of MCL 500.3145(1) does not support Justice Weaver's assertion that the second and third sentences of MCL 500.3145(1) do not set forth separate periods of limitations.  The reason is that the first sentence plainly states that an action must be commenced within one year of the date of the accident *unless* notice is given or the insurer has previously paid benefits.  The word "unless" is commonly defined as meaning "except under the circumstances that,"

---

[26]*Devillers, supra* at 574, quoting *Welton, supra* at 576.

[27] It is baffling that Justice Weaver argues here that we should overrule *Welton* and *Devillers*, and change the interpretation given to MCL 500.3145(1) for over 20 years, given that she so often argues that we should leave erroneously decided cases intact simply because they are, in her words, "longstanding precedent."  *Devillers, supra* at 620 (Weaver, J., dissenting).  What is even stranger is that in *Devillers* this Court overruled part of *Welton* that was inconsistent with the statute, but Justice Weaver dissented on the ground that although *Welton* and its progeny were wrongly decided they should not be overruled because they had been in effect for a long time.  *Id.*  In this case, however, she argues that we should overrule another part of *Welton* with no concern whatsoever for how long it has been in effect.  Moreover, she lobbies for the overruling of *Welton* and *Devillers* without engaging in any analysis of whether their interpretation of MCL 500.3145(1) defies practical workability. *Robinson v Detroit,* 462 Mich 439, 464-467; 613 NW2d 307 (2000).

[28] *Post* at 3-4.

16

or "except; but; save."[29]  Thus, in cases where the insured has given notice or the insurer has previously paid benefits, the one-year period of limitations that starts on the date of the accident is *not* tolled as Justice Weaver asserts.  Rather, the plaintiff is excepted from that period of limitations and, instead, is subject to the separate and distinct period of limitations for filing suit that starts at the time of the most recent loss.  Similarly, because the word "unless" does not create a tolling period, the one-year-back rule is not merely a "detail" of a tolling period as Justice Weaver asserts, but is, as this Court has always held, its own distinct period of limitations.

Justice Weaver also argues that the one-year-back rule *only* applies to actions subject to the later period of limitations that begins on the date of the most recent loss because notice was given or benefits were previously paid, and that it *does not* apply to actions filed pursuant to the earlier period of limitations that starts on the date of the accident that may have been tolled because of the application of MCL 600.5851(1), equitable estoppel, or some other reason. Her argument is that because the Legislature began the third sentence of MCL 500.3145(1), which creates the one-year-back rule, with the word "however," that sentence only relates back to the second sentence of MCL 500.3145(1).

Although she does not directly reference it, Justice Weaver appears to be relying on the last antecedent rule, which provides that a modifying clause is

---

[29] *Random House Webster's College Dictionary* (2001).

17

confined solely to the last antecedent.[30] However, the last antecedent rule does not apply where the modifying clause is set off by a punctuation mark, such as a comma or, in this case, a period.[31] Moreover, the last antecedent rule does not apply if something in the statute's subject matter or dominant purpose requires a different interpretation.[32] As we have consistently noted, a dominant legislative purpose permeating throughout the no-fault act is to ensure that this mandatory coverage is affordable.[33] Accordingly, declining to utilize the last antecedent rule to limit the one-year-back rule's application in the manner proposed by Justice Weaver "is consistent with the Legislature's overarching commitment in the no-fault act, and its later amendments, to facilitating reasonable economies in the

---

[30] *Dessart v Burak,* 470 Mich 37, 41; 678 NW2d 615 (2004); *Sun Valley Foods Co v Ward,* 460 Mich 230, 237; 596 NW2d 119 (1999).

[31] *People v Small,* 467 Mich 259, 263 n 4; 650 NW2d 328 (2002), citing 2A Singer, Sutherland on Statutory Construction (6th ed), § 47.33, pp 369, 373.

[32] *Dessart, supra* at 41. It is odd that Justice Weaver here attempts to overrule *Devillers* and *Welton* on the basis of the last antecedent rule when she has herself recently argued that the rule is "optional, not mandatory," "'not inflexible and uniformly binding,'" and inapplicable "'[w]here the sense of the entire act requires that a qualifying word or phrase apply to several preceding or even succeeding sections.'" *Dessart, supra* at 44 (Weaver, J., concurring in the result), quoting 2A Singer, Sutherland on Statutory Construction (6th rev ed), § 433, p 372.

[33] See *Jarrad v Integon Nat'l Ins Co,* 472 Mich 207, 218; 696 NW2d 621 (2005); *Griffith v State Farm Mut Automobile Ins Co,* 472 Mich 521, 539; 697 NW2d 895 (2005); *Cruz v State Farm Mut Automobile Ins Co,* 466 Mich 588, 597; 648 NW2d 591 (2002); *Celina Mut Ins Co v Lake States Ins Co*, 452 Mich 84, 89; 549 NW2d 834 (1996); *O'Donnell v State Farm Mut Ins Co,* 404 Mich 524, 547; 273 NW2d 829 (1979); *Shavers v Attorney General,* 402 Mich 554, 607-611; 267 NW2d 72 (1978).

payment of benefits, thus causing the costs of this mandatory auto insurance to be more affordable."[34]

## VII.  CONCLUSION

We hold that the minority/insanity tolling provision in MCL 600.5851(1), by its plain terms, only addresses when an action may be brought.  Therefore, it does not apply to toll the one-year-back rule in MCL 500.3145(1) because that provision does not concern when an action may be brought but, instead, limits the amount of PIP benefits a person injured in an automobile accident may recover. Accordingly, the decision of the Court of Appeals reversing the trial court's denial of defendant's motion for summary disposition and remanding this case to the circuit court for entry of summary disposition in defendant's favor is affirmed. However, because the Court of Appeals unnecessarily addressed the issue whether the legislative amendments of MCL 600.5851(1) in 1993 PA 78 render the minority/insanity tolling provision inapplicable to causes of action for which the statute of limitations is not set forth in the RJA, its analysis of that issue is vacated.

Affirmed in part and vacated in part.

> Clifford W. Taylor
> Maura D. Corrigan
> Robert P. Young, Jr.
> Stephen J. Markman

---

[34] *Jarrad, supra* at 218.

19

STATE OF MICHIGAN

SUPREME COURT

DIANE CAMERON and JAMES CAMERON,
Co-Guardians of the Estate of Daniel
Cameron,

     Plaintiffs-Appellants,

v                                      No. 127018

AUTO CLUB INSURANCE ASSOCIATION,

     Defendant-Appellee.

_____

MARKMAN, J. (*concurring*).

I concur in the majority's analysis and conclusion that the minority/insanity tolling provision of the Revised Judicature Act, MCL 600.5851(1), does not toll the one-year-back rule of the no-fault automobile insurance act, MCL 500.3145(1).[1] I write separately to elaborate on the majority's analysis and to express certain reservations concerning the decision reached in these opinions.

(1) I am concerned that as a consequence of this decision, the protections afforded by the tolling provision may become increasingly illusory. This

---

[1] For the reasons set forth in this opinion, I do disagree with the majority opinion's statement that whether legislation is or is not "absurd" is "irrelevant." *Ante* at 12.

provision allows minors and insane persons to bring civil actions within one year after their legal disabilities have been removed. However, the one-year-back rule of the no-fault automobile insurance act allows such persons to recover only those losses incurred during the one year before the commencement of the action. In other words, although the tolling provision instructs minors and insane persons that they are entitled to wait until one year after their legal disabilities have been removed to bring their civil actions, if they do wait, they will only be allowed to recover what may be a portion of the total damages incurred.[2]

(2) Further, I am concerned that, although the tolling provision was intended to protect minors and insane persons, as a consequence of this decision, when such persons are injured in an accident in which others are also injured, they are likely to be undercompensated for equivalent medical expenses compared to other persons. If, for example, both an adult and a minor are injured in an automobile accident, the adult will be able to file an action and potentially recover *all* of his losses, while the minor who chooses to wait until he is 18 years old to file an action, as the tolling provision allows, will be able only to recover those losses that were incurred within the one-year period preceding the action.

---

[2] The largest portion of medical expenses ordinarily will have been incurred in the immediate aftermath of a covered accident rather than during the year immediately preceding the filing of the tolled cause of action. Indeed, the longer the period of tolling-- for example, the younger the child at the time of the covered accident-- the smaller the portion of overall medical expenses that will ordinarily have been incurred during the one-year-back period.

2

(3) I am concerned that as a consequence of this decision, what is arguably the larger purpose of the tolling provision will be undermined. The tolling provision temporarily places the statute of limitations on hold for minors and insane persons. The purpose of tolling generally is to allow protected classes of persons an opportunity to be made whole once their disabilities have been removed. However, if the tolling provision in MCL 600.5851(1) does not also toll the one-year-back rule of MCL 500.3145(1), minors and insane persons will not necessarily be made whole. Rather than being allowed to recover all of the expenses incurred during their periods of tolling, these classes of individuals will be limited to only one year's worth of compensation. This is a result inconsistent with most other statutory tolling provisions.

(4) Finally, I am concerned that as a consequence of this decision, it will border on legal malpractice for an attorney ever to recommend reliance on the minority/insanity tolling period, for a person acting in such reliance may learn too late that the person whose interests he is protecting in this regard has been deprived of several years' worth of compensation. In this regard, the tolling provision would seem to be more of a snare than a protection.

In the end, however, despite these concerns, I agree with the majority that the tolling provision of MCL 600.5851(1) does not toll the one-year-back rule of MCL 500.3145(1). I believe that this conclusion is mandated by the plain language of these statutes, and that there is at least an arguable rationale in support of the reasonableness of a statute producing this result. Moreover, I do not believe

3

that I possess the judicial authority to impose what some, including myself, might view as a more "logical," a more "rational," or a more "consistent" structure for these statutes.

MCL 600.5851(1) provides, in pertinent part:

> [I]f the person first entitled to make an entry or bring an action under this act is under 18 years of age or insane at the time the claim accrues, the person or those claiming under the person shall have 1 year after the disability is removed through death or otherwise, to make the entry or *bring the action* although the period of limitations has run. [Emphasis added.]

MCL 500.3145(1) provides, in pertinent part:

> [T]he claimant may not *recover benefits* for any portion of the loss incurred more than 1 year before the date on which the action was commenced. [Emphasis added.]

It is a long-accepted principle of statutory construction that "[s]tatutes which may appear to conflict are to be read together and reconciled, if possible." *People v Bewersdorf*, 438 Mich 55, 68; 475 NW2d 231 (1991). Although the two statutes in controversy may appear to be in tension, and while they clearly serve different legislative interests, these statutes nonetheless *can* be reconciled.

The tolling provision allows a protected person to "bring [an] action although the period of limitations has [otherwise] run" as long as the action is brought within one year after the legal disability of minority or insanity has been removed. At the same time, the one-year-back rule prohibits a person from "recover[ing] benefits for any portion of the loss incurred more than 1 year before the date on which the action was commenced."

4

Although the tolling provision temporarily delays the operation of the statute of limitations, the one-year-back rule is plainly not a statute of limitations, and therefore is plainly not the subject of tolling. As the lead opinion in *Howard v Gen Motors Corp,* 427 Mich 358, 385-386; 399 NW2d 10 (1986) (holding that the one-year- and two-year-back rules of the Worker's Disability Compensation Act are not statutes of limitations), explained:

> Simply stated, they are not statutes that limit the period of time in which a claimant may file an action. Rather, they concern the time period for which compensation may be awarded once a determination of rights thereto has been made.
>
> Moreover, the one- and two-year-back rules do not serve the same purposes as do typical statutes of limitations.
>
> * * *
>
> The rules do not perform the functions traditionally associated with statutes of limitations because they do not operate to cut off a claim, but merely limit the remedy obtainable. They do not disallow the action or the recovery-- a petition may be filed long after an injury and benefits may be awarded in response thereto-- they merely limit the award once it has been granted.

The one-year-back rule of the no-fault automobile insurance act is indistinguishable from the one-year and two-year-back rules of the Worker's Disability Compensation Act. As do the latter, the former serves by its straightforward language only as a limitation on the recovery of benefits; it does not define a period within which a claimant may file a cause of action. Therefore, the one-year-back rule is not a statute of limitations, and it lies outside the scope of what is affected by the minority/insanity tolling provision.

5

The tolling provision of MCL 600.5851(1) tolls the limitation that applies to the "bring[ing of an] action"; however, it does not toll the limitation that applies to the "recover[y of] benefits," in particular the limitation set forth in MCL 500.3145(1). Accordingly, although a plaintiff may not be prohibited from "bring[ing] the action," a plaintiff is prohibited from "recover[ing] benefits for any portion of the loss incurred more than 1 year before the date on which the action was commenced."

I agree with the majority that the two statutes compel this conclusion. In the final analysis, this is not a conclusion that reflects the will of this Court, or that of individual justices, but one that reflects the will of the people of Michigan acting through their legislative representatives. The majority's conclusion is the only one, in my judgment, that accords reasonable meaning to the actual language of the laws, as opposed to the language of the law that might have been enacted but never was. Only if this Court ignores, or contorts, the language of the one-year-back rule can it fairly be encompassed within the language of the tolling provision.[3]

---

[3] Justice Cavanagh describes me at oral argument as having "aided" defendant in devising an alternative argument. This is a fair characterization of what occurred only if asking a question concerning a matter that neither of the parties had previously given thought can be described as having "aided" a party. While my questioning did, in fact, "aid" this Court in getting the meaning of the law right, it did not apparently "aid" in producing the result desired by the dissenting justices.

Moreover, unlike Justice Kelly, I do not believe that the result reached by the majority can fairly be characterized as an "absurd result" for which some limited judicial reformation might be appropriate.[4] Unlike some of my colleagues,

---

[4] The "absurd results" rule has been described as one that asserts that "[i]t will always . . . be presumed that the legislature intended exceptions to its language, which would avoid [absurd consequences]." *United States v Kirby*, 74 US 482, 486-487; 19 L Ed 278 (1868). The United States Supreme Court has consistently adhered to this rule. As early as 1819, the Court asserted in *Sturges v Crowninshield*, 17 US 122, 202-203; 4 L Ed 529 (1819), that the absurdity of an interpretation warranted a departure from the plain meaning of the words. See also *Kirby, supra*; *Armstrong Paint & Varnish Works v Nu-Enamel Corp*, 305 US 315, 333; 59 S Ct 191; 83 L Ed 195 (1938) ("[T]o construe statutes so as to avoid results glaringly absurd, has long been a judicial function.") Justice Story has also observed, "Where [the law's] words are plain, clear, and determinate, they require no interpretation; and [such interpretation] should, therefore, be admitted, if at all, with great caution and only from necessity, either to escape some absurd consequence, or to guard against some fatal evil." 1 Story, Commentaries on the Constitution of the United States (5th ed), § 405.

In addition, Michigan has always adhered to the "absurd results" rule, at least until its apparent reversal in *People v McIntire,* 461 Mich 147; 599 NW2d 102 (1999), a case referencing none of our earlier decisions in this regard. As early as *Green v Graves*, 1 Doug 351, 354 (Mich, 1844), this Court stated, "The reason and intention of the lawgiver will control the strict letter of the law" when the latter would lead to "absurdity." To name only a few cases, see also *Campau v Seeley*, 30 Mich 57, 62 (1874); *People v Labbe*, 202 Mich 513, 520; 168 NW 451 (1918); *Attorney General v Detroit U R Co*, 210 Mich 227, 254; 177 NW 726 (1920); *Grand Rapids v Crocker*, 219 Mich 178, 183-184; 189 NW 221 (1922)*; Cytacki v Buscko*, 226 Mich 524, 528; 197 NW 1021 (1924); *Lukazewski v Sovereign Camp of the Woodmen of the World*, 270 Mich 415, 421; 259 NW 307 (1935); *Mondou v Lincoln Mut Cas Co*, 283 Mich 353, 358; 278 NW 94 (1938); *Elba Twp v Gartiot Co*, 287 Mich 372, 394; 283 NW 615 (1939); *Wayne Co Bd of Rd Comm'rs v Wayne Co Clerk*, 293 Mich 229, 236; 291 NW 879 (1940); *Superx Drugs Corp v State Bd of Pharmacy*, 378 Mich 430, 457; 146 NW2d 1 (1966) (opinion by O'Hara, J.); *Salas v Clements*, 399 Mich 103, 109; 247 NW2d 889 (1976); *Metro Council No 23 AFSCME v Oakland Co Prosecutor*, 409 Mich 299, 325, 327-328; 294 NW2d 578 (1980); *Owendale-Gagetown School Dist v State Bd of Ed*, 413 Mich 1, 8; 317 NW2d 529 (1982); *Achtenberg v East Lansing*, 421 Mich 765, 772; 364 NW2d 277 (1985); *State Treasurer v Wilson*, 423 Mich 138,

(continued…)

7

I believe that the "absurd results" rule is one that complements and reinforces the doctrine of interpretivism. Cf. *People v McIntire,* 461 Mich 147; 599 NW2d 102 (1999), rev'g *People v McIntire,* 232 Mich App 71; 591 NW2d 231 (1998); *Piccalo v Nix*, 466 Mich 861 (2002). As observed by Justice Scalia, "it is a venerable principle that a law will not be interpreted to produce absurd results." *K mart Corp v Cartier, Inc,* 486 US 281, 324 n 2; 108 S Ct 1811; 100 L Ed 2d 313 (1988) (Scalia, J., concurring in part and dissenting in part). The "absurd results" rule underscores that the ultimate purpose of the interpretative process is to accord respect to the judgments of the lawmakers. While it must be presumed that these judgments are almost always those reflected in the words used by the lawmakers, in truly extraordinary cases, exercise of the "judicial power" allows recognition of the fact that no reasonable lawmaker could conceivably have intended a particular result. As Justice Kennedy observed in a concurring opinion in *Public Citizen v United States Dep't of Justice*, 491 US 440, 470; 109 S Ct 2558; 105 L Ed 2d 377 (1989), the "absurd results" rule "demonstrates a respect for the coequal Legislative Branch, which we assume would not act in an absurd way."

_____

(…continued)

145-146; 377 NW2d 770 (1985); *Gobler v Auto-Owners Ins* Co, 428 Mich 51, 62; 404 NW2d 199 (1987); *People v Stoudemire*, 429 Mich 262, 267; 414 NW2d 693 (1987); *Belanger v Warren Consolidated School Dist*, *Bd of Ed,* 432 Mich 575, 589; 443 NW2d 772 (1989); *Bewersdorf, supra* at 68. See also the subsequent decision of this Court in *Rafferty v Markovitz*, 461 Mich 265, 270; 602 NW2d 367 (1999) ("[S]tatutes must be construed to prevent absurd results . . ."). Moreover, I am unaware of any state other than Michigan that lacks an "absurd result" rule as an aspect of its legal system.

However, the "absurd results" rule must not be invoked whenever a court is merely in disagreement, however strongly felt, with the policy judgments of the Legislature. This, in my judgment, is essentially what Justice Cavanagh does here *sub silentio* and what Justice Kelly does here expressly. Although the Court's holding in this case maintains a law within our state that is contrary to that which seems to me most rational, and although I have doubts concerning whether individual members of the 71st Legislature genuinely had in mind this law,[5] I do believe that a reasonable lawmaker conceivably could have intended these results.

Such a lawmaker, for example, *might* have intended these results in order to make no-fault insurance more affordable. See *Griffith v State Farm Mut Automobile Ins Co*, 472 Mich 521, 539; 697 NW2d 895 (2005) (stating that this Court has always been cognizant of the potential problem of "cost containment for this mandatory coverage" when interpreting the no-fault act), citing *Shavers v Attorney General*, 402 Mich 554, 599; 267 NW2d 72 (1978) (holding that "[i]n choosing to make no-fault insurance compulsory for all motorists, the Legislature has made the registration and operation of a motor vehicle inexorably dependent on whether no-fault insurance is available at fair and equitable rates"); *Jarrad v Integon Nat'l Ins Co*, 472 Mich 207, 218; 696 NW2d 621 (2005) (recognizing "the Legislature's overarching commitment in the no-fault act, and its later amendments, to facilitating reasonable economies in the payments of benefits, thus

---

[5] The 71st Legislature enacted the tolling provision, the later-enacted statute of the two statutes at issue here.

9

causing the costs of this mandatory auto insurance to be more affordable"); *Cruz v State Farm Mut Automobile Ins Co*, 466 Mich 588, 597 n 13; 648 NW2d 591 (2002) (recognizing that "[c]oncern about the affordability of no-fault insurance has caused the Legislature over the years to amend the no-fault act in order to reduce the scope of mandatory coverages"); *State Farm Fire & Cas Co v Old Republic Ins Co*, 466 Mich 142, 151; 644 NW2d 715 (2002) (recognizing that "the Legislature has, consistent with its ongoing efforts over the years, attempted to make such mandatory insurance affordable"); *Marquis v Hartford Accident & Indemnity (After Remand)*, 444 Mich 638, 654-655; 513 NW2d 799 (1994) (recognizing that "a primary goal of the no-fault act is to 'provid[e] an equitable and prompt method of redressing injuries in a way which made the mandatory insurance coverage affordable to all motorists'"), quoting *Tebo v Havlik*, 418 Mich 350, 366; 343 NW2d 181 (1984); *Celina Mut Ins Co v Lake States Ins Co*, 452 Mich 84, 89; 549 NW2d 834 (1996) (holding that "the no-fault insurance system . . . is designed to provide victims with assured, adequate, and prompt reparations at the lowest cost to both the individuals and the no-fault system"); *O'Donnell v State Farm Mut Automobile Ins Co*, 404 Mich 524, 547; 273 NW2d 829 (1979) (recognizing that the Legislature has provided for setoffs in the no-fault act: "Because the first-party insurance proposed by the act was to be compulsory, it was important that the premiums to be charged by the insurance companies be maintained as low as possible[;] [o]therwise, the poor and the disadvantaged people of the state might not be able to obtain the necessary insurance").

10

Conceivably as well, a reasonable lawmaker *might* have intended to maintain the solvency of insurers, and to enhance their ability to undertake future planning, by protecting them from multimillion dollar lawsuits filed many years after medical expenses have been incurred, and only after relatively manageable month-to-month expenses have been allowed to develop into more extraordinary decade-to-decade expenses. Such a lawmaker *might* have sought to obligate those who have incurred medical expenses to seek reimbursement on a relatively ongoing basis, rather than allowing them to wait for many years before seeking compensation. Indeed, it is conceivable that a reasonable lawmaker *might* have wished to incentivize earlier, rather than later, causes of action in order to encourage those who have incurred medical expenses to act in a manner consistent with their own financial self-interest,[6] and to ensure that their medical expenses were reimbursed expeditiously.

Finally, a reasonable lawmaker *might* have concluded that practical problems pertaining to evidence and proofs in old claims required some balance between the interests of the insured and those of the insurer.

---

[6] Indeed, it seems certain that the tolling provision will come into play in only a very small portion of all minor/insanity medical expense no-fault cases, and that most claimants will file actions on a timely, "untolled" basis, because whoever has incurred expenses on behalf of a minor or insane person will have an obvious financial interest in being reimbursed for such expenses as expeditiously as possible.

I am inclined to believe that the principal purpose of the minority/insanity tolling provision is to afford minors and insane persons an opportunity to be made litigatively whole once their disabilities have been removed. However, what I discern as the principal purpose of the tolling provision cannot be allowed to trump its actual language. To allow such a result would enable the judge to impose on the law his own characterization of its unstated "purpose" and trump the actual words of the law. Instead, I believe, it must be assumed that these actual words better address the "purpose" of the statute than some broad characterization divined by the judge.[7] The actual language of the tolling provision merely preserves the right to "bring [an] action"; whatever I might suppose to have been in the minds of individual legislators, and whatever I might speculate as the purpose of this law, the law *itself* says nothing about making the protected person litigatively whole.

Although the general purpose of tolling statutes is to render the beneficiary whole in his cause of action, the precise issue in this case is whether this purpose remains intact where there is, as here, a one-year-back rule-- an equally applicable

---

[7] One of the problems, of course, with a focus on the "purpose" of a statute, as opposed to its actual language, is that the former can be characterized at widely different levels of remove from the statute. If the "purpose" of the tolling statute is not to achieve the ends compelled by its plain words, is the "purpose" instead to toll the period of limitations without regard for other statutes? Is it to place minors and insane persons in an identical position with others who have filed claims for medical expenses immediately upon incurring such expenses? Is it to optimize litigative opportunities for minors and insane persons to file lawsuits? Is it generally to do good things for minors and insane persons?

one-year-back rule.[8]  The interpretative accommodation reached by the majority gives meaning to both provisions, while the approach of the dissents would give no meaning in the present context to either the one-year-back statute or the "bring the action" language in the tolling statute.

In *Geiger v Detroit Automobile Inter-Ins Exch,* 114 Mich App 283; 318 NW2d 833 (1982), the Court of Appeals held that the minority/insanity tolling provision does toll the one-year-back rule of the no-fault automobile insurance act. However, the only reason it gave for reaching such a conclusion is that "[a] contrary rule would severely limit the utility of the minority saving provision . . . ." *Id.* at 291.  I do not necessarily disagree with *Geiger* that not tolling the one-year-back rule may well "limit the utility" of the tolling provision, perhaps even "severely," but that is often what happens when there are statutes that are in tension with one another.  It can be argued just as easily that to do the opposite, to toll the one-year-back rule, would be to "severely limit the utility" of the one-year-back rule.  Indeed, it can be argued that to toll the one-year-back rule is not merely to "severely limit its utility," but to do it even greater damage by vitiating its language altogether.  In the end, the *Geiger* rationale is not even a legal rationale at all; rather, it is little more than a statement by the majority in

---

[8] I am aware of only one other statutory one-year-back rule.  See MCL 418.833(1) (the one-year-back rule of the Worker's Disability Compensation Act), referred to earlier in this opinion.  There is no decision of this Court reconciling this provision and any applicable tolling provision.

*Geiger* that it preferred a different statute than the one actually enacted by the Legislature. In this regard, it is no different than the dissents in this case.

This Court lacks the authority to alter a statute simply because it is confident that such alteration will better fulfill some supposed purpose. While I believe that this Court has an obligation to avoid genuinely "absurd results," a statute that is simply less well-crafted than a judge believes it could have been is not for that reason "absurd." Something is "absurd" as a matter of law, justifying the extraordinary remedy of judicial reformation, only if it is "utterly or obviously senseless, illogical, or untrue; contrary to all reason or common sense; laughably foolish or false." *Random House Webster's College Dictionary* (1991). Justice Scalia has described results as being "absurd" when they are "unthinkable," "bizarre," or "startling." *Green v Bock Laundry Machine Co,* 490 US 504, 527; 109 S Ct 1981; 104 L Ed 2d 557 (1989) (Scalia, J., concurring); *City of Columbus v Ours Garage & Wrecker Service, Inc,* 536 US 424, 450 n 4; 122 S Ct 2226; 153 L Ed 2d 430 (2002) (Scalia J., dissenting). He has described a statute as "absurd" when it "cannot have been meant literally," or when it "cannot rationally . . . mean" what it seems to mean. *Green, supra* at 528.[9]

---

[9] Black's Law Dictionary (5th ed) defines "absurdity" as "[a]nything which is so irrational, unnatural, or inconvenient that it cannot be supposed to have been within the intention of men of ordinary intelligence and discretion." There are a variety of alternative formulations of the "absurd results" rule. See, e.g., *Crooks v Harrelson*, 282 US 55, 60; 51 S Ct 49; 75 L Ed 2d 156 (1930) ("so gross as to shock the general moral or common sense"); *Sturges, supra* at 203 ("so monstrous, that all mankind would, without hesitation, unite in rejecting the application"); *Public Citizen, supra* at 471 (Kennedy, J., concurring) ("quite

(continued…)

Justices Cavanagh and Kelly, in contrast, effectively define as an "absurd result" one that is merely imperfect or flawed, one that is merely susceptible to improvement. Unencumbered, as this Court is, by the need of the legislative branch to engage in compromise and give-and-take between many competing social interests, Justices Cavanagh and Kelly invoke an "absurd results" rule simply on the basis that the legislative process has produced what, in their view, is a law that is less "consistent" and less "effective" than it could have been.

As explained above, however, there are a number of reasons why the Legislature *might* have intended the statute that *Geiger* derogated. Because the actual language of the minority/insanity tolling provision of the RJA does not toll the one-year-back rule of the no-fault automobile insurance act, and because such a result cannot fairly be said to be "absurd," I believe that this Court lacks the authority to reform this statute and to construe it in a manner contrary to its language.[10]

_____

(…continued)

impossible that [the Legislature] could have intended the result"); *Green, supra* at 511 ("can't mean what it says"); *Green, supra* at 527 (Scalia, J., concurring) ("an unthinkable disposition").

[10] Justice Kelly, who insists on approaching the instant matter from the perspective of one authorized to second-guess the legislative branch, inquires, *post* at 24 n 61, "What legislator would find it *reasonable* to reduce the cost of insurance by leaving children and the insane with little or no recovery for their injuries?" (Emphasis added.) As I have made clear in this opinion, I doubt that I would if I were a legislator, and it seems that neither would Justice Kelly, but, of course, we are not legislators. Rather, we are judges. Therefore, the proper inquiry is not that of Justice Kelly but rather, "Is it *quite impossible* or is it *quite unthinkable* that a legislator would enact this legislation?" See, e.g., *Public*

(continued…)

15

In the end, I cannot read the minds of those who enacted the two statutes in question, and I do not profess to understand what may have been secretly harbored in these minds. The most fundamental rule of statutory construction is that the actual words of the statutes are "the best indicator of the Legislature's intent." *Kreiner v Fischer,* 471 Mich 109, 129; 683 NW2d 611 (2004). For the reasons set forth above, the actual words of the two statutes here lead me to agree with the majority that the minority/insanity tolling provision does not toll the one-year-back rule. However, also for the reasons set forth above, I would respectfully urge the

---

(…continued)

*Citizen*, *supra* at 471; *Green*, *supra* at 511. Justice Kelly, by ignoring virtually every conceivable rationale for MCL 600.5851(1) set forth in this and in the majority opinion, not only transforms the "absurd result" rule beyond all recognition, but through her characterization of this law at its most indefensible, rather than at its most defensible, as she is obligated to do as a judge, demonstrates an inappropriate willingness to substitute her judgment for that of the Legislature. The Legislature is entitled to make dubious policy judgments without myself, or Justice Kelly, being thereby authorized to act as lawmakers-in-chief.

present Legislature to review the opinions in this case and to ascertain whether the

Court's holding is consistent with the Legislature's present intentions.

Stephen J. Markman

STATE OF MICHIGAN

SUPREME COURT

DIANE CAMERON AND JAMES
CAMERON, Co-Guardians of the
Estate of Daniel Cameron,

        Plaintiffs-Appellants,

v                              No. 127018

AUTO CLUB INSURANCE
ASSOCIATION,

        Defendant-Appellee.

_____

CAVANAGH, J. (*dissenting*).

This case is essentially the second installment[1] of defendant's attempt to further immunize itself and other insurers from having to pay benefits indisputably owed to their injured insured—people who have diligently paid policy premiums with the expectation that, should they be injured, their insurer will reimburse them for all allowable expenses. While in *Devillers* defendant targeted people who had not filed suit because of insurer delay, in this case, defendant targets infants and the legally incompetent.

MCL 500.3145(1), a provision of the no-fault automobile insurance act, contains what is known as the "one-year-back rule." The provision states that when an insurer is on notice of a plaintiff's claim for injury expense

reimbursement, the plaintiff has one year after the most recent allowable expense was incurred to bring an action to recover accident-related expenses. The provision also states that the claimant cannot "recover benefits for any portion of the loss incurred more than 1 year before the date on which the action was commenced." *Id.* It is that latter portion that is known as the one-year-back rule.

In *Devillers*, *supra*, a majority of this Court held that the one-year-back rule prevents a plaintiff from recovering expenses incurred before the one-year deadline even when the reason suit has not been filed is because the insurance company has not yet denied the plaintiff's claim. In other words, the majority gave insurers an open invitation to delay responding to an insured's claim for however long it wishes so that it can profit from the fact that most prudent people are not going to rush into court before at least hearing from their insurance company that their claim has been denied. Normally, after submitting a claim to an insurer, the insured waits for a response. But under *Devillers*, if the unwary person hears nothing—and, thus, does not file suit—for over a year, the person loses the right to collect the benefits that accrued before the one-year period preceding suit.[2] Turning a blind eye to the no-fault act's goal of *reducing* litigation, the majority categorically ensured an onslaught of resource-wasting

_____
(…continued)

[1] *Devillers v Auto Club Ins Ass'n*, 473 Mich 562; 702 NW2d 539 (2005), was the first.

[2] Even if the plaintiff diligently pursues a response from the insurance company or is actively negotiating with the insurer, the result is the same. If the insurer holds out for over a year, the reduction in owed benefits begins.

2

peremptory lawsuits that were previously unnecessary under *Lewis v Detroit Automobile Inter-Ins Exch*, 426 Mich 93; 393 NW2d 167 (1986), a case that had effectively balanced the rights of the insurer and the insured for nearly 20 years.

Close on the heels of *Devillers*, defendant now argues that MCL 600.5851(1), a provision of the Revised Judicature Act (RJA) that preserves the claims of minors and the insane until one year after the disability is removed,[3] should not apply to claims brought under the no-fault act. Stated differently, defendant argues that despite an injured person's infancy or inability to understand his rights, that person is not excepted from the rules of MCL 500.3145(1), so the saving provision specifically crafted to protect these groups is meaningless. Thus, under defendant's argument, infants and the legally incompetent who "wait" for more than one year to file suit for damages owed them are precluded from recovering all damages incurred outside the one-year period that precedes their filing. Apparently, in defendant's view, there is no

---

[3] The provision states:

> Except as otherwise provided in subsections (7) and (8), if the person first entitled to make an entry or bring an action under this act is under 18 years of age or insane at the time the claim accrues, the person or those claiming under the person shall have 1 year after the disability is removed through death or otherwise, to make the entry or bring the action although the period of limitations has run. This section does not lessen the time provided for in section 5852. [MCL 600.5851(1).]

> "Insane" is defined as a condition of mental derangement such as to prevent the sufferer from comprehending rights he or she is otherwise bound to know and is not dependent on whether or not

(continued…)

reason to distinguish between people of age and with their full faculties from those who have the misfortune of being under a legal disability.

Aided by Justice Markman at oral argument, defendant eventually devised an alternative argument on which we accepted supplemental briefing and argument.[4]  Under this alternative theory, defendant argues that we need not reach the issue whether the RJA applies to the no-fault act because all the damages plaintiff requests in this case were incurred before the one-year-back period.  Under defendant's logic, then, no unique considerations are made for underage or mentally incompetent insureds with respect to the no-fault act's one-year-back rule on damages.  In other words, even if a person is incapable, by virtue of his disability, of protecting his rights by bringing suit until that disability is removed, the person is still prevented from recovering any damages

_____
(…continued)
> the person has been judicially declared to be insane.  [*Id.* at § 5851(2).]

[4] Justice Markman objects to my characterization of his statements as "aiding" a party.  While there is certainly no bar to asking a party about various legal theories, in this particular case, counsel for defendant explicitly disagreed in his brief to this Court and at oral argument that any distinction could or should be made between the statute of limitations and the one-year-back rule in the context of the saving provision of MCL 600.5851.  Clearly, then, defendant understood and accepted as sensible the prevailing legal precedent that allowed minors and incompetents to preserve their claims in full and saw no reason to revisit the longstanding rule that a "claim" encompassed not only the mere filing of a lawsuit, but also the ability to recover all damages alleged to be owed.  In other words, counsel saw no reason to, and did not, challenge settled law.  Rather, counsel endeavored to persuade this Court to overturn settled law only after being "aided" by Justice Markman into seeing a golden opportunity to do so successfully.  It is in that peculiar context that I find this sequence of events disconcerting.

that were incurred more than a year before the date the person does manage to bring suit.

Having already assisted the defendant's coup of cutting off benefits when the latter's own delay is the impetus for a plaintiff's delay in filing suit, see *Devillers*, *supra*, the majority now approves cutting off owed benefits not because of a plaintiff's lack of diligence and not even in the face of an insurer's delay tactic, but simply because it chooses to drastically curtail the protection provided by the Legislature for infants and the incompetent.

The issue the majority dismisses today finds its genesis in *Lambert v Calhoun*, 394 Mich 179; 229 NW2d 332 (1975). In *Lambert*, this Court held that the RJA's saving provision applies to causes of action created by statute, even when the statute sets forth its own limitations period. When this Court determined in 1975 that there was no indication that the Legislature intended the saving provision to apply only to common-law causes of action, it explained as follows:

> The need and desirability for saving in one case are the same as in the other. Infants or insane persons are under the same disability whether their actions be common-law or statutory; the defendant in one case is generally in no greater need than the defendant in the other of protection from delay in commencement of the action. We are unable to distinguish the two cases or to ascribe to the Legislature such an intention. [*Lambert*, *supra* at 191.]

While the *Lambert* Court was comparing the right of a disabled person to bring a common-law cause of action to that person's right to bring a statutory one, the lack of reason to distinguish between the two is, of course, universal. A

5

person without capacity to bring a common-law claim is equally without capacity to bring suit under a statute. Likewise, a person without capacity to bring suit under some other act is equally without capacity to bring suit under the no-fault act.

As much was found in a subsequent case when the Court of Appeals explicitly held that the saving provision applies to the no-fault act. *Rawlins v Aetna Casualty & Surety Co*, 92 Mich App 268; 284 NW2d 782 (1979).[5] Further examining the interplay between the saving provision and the no-fault act, the Court of Appeals, in *Geiger v Detroit Automobile Inter-Ins Exch*, 114 Mich App 283; 318 NW2d 833 (1982), discussed the purposes of the no-fault act's one-year period of limitations, its one-year-back rule, and the RJA's saving provision. In its analysis, the panel detailed the reasoning behind its ultimate conclusion that when the saving provision allows a claimant to sue despite the expiration of the no-fault act's period of limitations, the saving provision has a corresponding effect on the one-year-back rule:

> The no-fault act, § 3145(1), does two things. First, it provides that an action to collect PIP [personal injury protection]

---

[5] I would not disturb that holding now, despite amendatory language in the RJA that changed the clause "if the person first entitled to make an entry or *bring any action*" to "if the person first entitled to make an entry or *bring an action under this act . . . .*" (Emphasis added.) As plaintiff's brief explains, "The RJA prescribes the jurisdiction of the courts, the basis of jurisdiction, and various other procedural guidelines within our civil justice system. It also prescribes a method for disputes to be resolved through the filing of a civil action. Specifically, at MCL 600.1901, the RJA states, 'a civil action is commenced by filing a complaint with the court.' Therefore, it is basic civil procedure that all lawsuits filed are brought 'under this act,' i.e., the RJA."

benefits must be commenced within one year after the date of the accident. The period is tolled if a proper notice is given to the insurer within one year. Second, it provides that a claimant may not recover benefits for losses incurred more than one year before the date the action was commenced.

From the above discussion, we know that RJA § 5851 allows an insured who is injured during his minority to commence an action within one year after attaining the age of majority, notwithstanding that the one-year period of limitations in § 3145(1) has expired. The question under present consideration is whether RJA § 5851 allows that person to collect PIP benefits for all expenses and losses incurred from the date of the accident, notwithstanding that § 3145(1) generally precludes recovery for expenses and losses incurred more than one year prior to the date the action was commenced. Although this is apparently a question of first impression, we believe that the minority saving provision of RJA § 5851 should apply to the "one year back" rule of § 3145(1), as well as to the one-year period of limitations therein.

The purpose of the one-year period of limitations is to encourage claimants or persons acting on their behalf to bring their claims to court while those claims are still fresh. *Burns v Auto-Owners Ins Co*, 88 Mich App 663; 279 NW2d 43 (1979), *Aldrich v Auto-Owners Ins Co*, 106 Mich App 83; 307 NW2d 736 (1981). The "one year back" portion of § 3145(1) has a similar policy.

In *Rawlins v Aetna Casualty & Surety Co*, *supra*, this Court held that RJA § 5851 applied to the one-year period of limitations in § 3145(1). The basis for the minority saving provision and the decision in *Rawlins* is that a person should not lose his claim during his minority, when he has no legal capacity to act on his own behalf. We believe that the *Rawlins* rule should also apply to the "one year back" portion of § 3145. A contrary rule would severely limit the utility of the minority saving provision and could deprive a person of benefits to which he would otherwise be rightfully entitled. In the present case, James Geiger, injured at the age of 16, incurred substantial medical expenses over the 2 years following the accident. He commenced this action approximately two weeks before his nineteenth birthday. Although his right to commence the action is preserved under *Rawlins*, *supra*, if we do not apply the minority saving provision to the "one year back" rule of § 3145, plaintiff would be effectively precluded from recovering PIP benefits for the medical expenses incurred during the two years immediately

7

following the accident. In order to advance the policy of RJA § 5851 and *Rawlins*, *supra*, we conclude that an insured who is injured during his minority and commences an action before his nineteenth birthday is entitled to collect PIP benefits for expenses and losses incurred from the date of the accident. [*Geiger*, *supra* at 290-291.]

As the *Geiger* Court recognized, there is little to no point to a saving provision that preserves a person's "action" or "claim" despite the fact that the period of limitations on the cause of action has expired, if that saving provision preserves merely the right to file papers rather than the right to recover damages that accrued during the time the claim was being "saved." Rather, the Legislature surely would not have intended to enact a hollow saving provision for people under a disability which would "save" only a sliver, if any, of the disabled's claim.[6] To interpret the one-year-back rule as limiting the disabled's damages defeats the very purpose of the saving provision: preserving a legally incompetent person's claim—the very nature of which is the seeking of damages—while the person is under a particular disability.

The majority finds that my reasoning, as well as that of the *Geiger* Court of Appeals panel, is based solely on personal preference and not informed by the rules of statutory construction. But by creating a saving provision for infants and the insane, the Legislature has conveyed its conviction that there is some

---

[6] As correctly noted by Justice Markman in his concurrence, if a person is injured in an motor vehicle accident while an infant or legally incompetent, and his injuries resolve a year or more before his disability resolves, then the majority's interpretation of MCL 500.3145(1) will completely preclude that

(continued…)

important reason to protect individuals in these groups—some characteristic that sets these individuals apart and merits giving them unique treatment. By its very existence, the saving provision recognizes that infants and the mentally infirm should be treated differently than others to whom the statute applies. The presence of the saving provision on the statute books is unrivaled evidence of legislative intent to "save" the claims of the disabled, and it is our obligation to discover what "save" means.

Should one undertake this endeavor, one would find that a saving provision that preserves the claims of the legally disabled until their disability is removed cannot be dismissed as a mere legislative whim. Rather, the saving provision is a necessary counterpart to the rule created by this Court that prohibits minors and the incompetent from bringing lawsuits on their own. MCR 2.201(E)(1)(b).[7] Under that rule, minors and incompetents who wish to pursue a cause of action have no choice but to be represented by a conservator or next friend.[8] Through the saving provision of MCL 600.5851(1), the Legislature has recognized not only that this group is prohibited from suing on its own, but that

_____

(…continued)
person from recovering *any* of the damages incurred from the accident, and, thus completely abrogate his claim.

[7] If a minor or incompetent person does not have a conservator to represent the person as plaintiff, the court shall appoint a competent and responsible person to appear as next friend on his behalf, and the next friend is responsible for the costs of the action.

[8] The appointment of these persons does not remove the disability. *Rittenhouse v Erhart*, 126 Mich App 674; 337 NW2d 626 (1983), aff'd in part and rev'd in part on other grounds 424 Mich 166 (1985).

not all infants and incompetents have the benefit of someone who takes the initiative to sue for them, and not all infants and incompetents can petition the court to appoint someone in that capacity. Presumably, the Legislature recognized that "whether such an action is in fact brought depends on good fortune since the [infant or] incompetent is helpless." *Kiley v Jennings, Strouss & Salmon*, 187 Ariz 136, 140; 927 P2d 796 (Ariz App, 1996). Thus, the saving provision, a necessary answer to our court rule, prevents the abrogation of the claims of infants and the incompetent.

By failing to consider the one-year-back rule of MCL 600.585(1) in the context of the saving provision of MCL 600.5851(1) and what that provision is actually designed to do, the majority only partially employs the tenet that the primary goal of statutory interpretation is to effect legislative intent. As such, it does a great disservice to the critical, indeed paramount, component of assessing a statute's overriding purpose. Instead of endeavoring to effectuate the clear purpose of the saving provision, or even questioning whether the interpretation of the one-year-back rule in this context should be informed by the saving provision, the majority misunderstands the saving provision and views the one-year-back rule in a vacuum. As a result, it reaches a cursory finding that MCL 500.3145(1) is "clear" because the one-year-back rule is not subject to "tolling."

The reader should not be misled into believing that only one interpretation is possible in this case or that everything is "clear." An honest reading of these statutes reveals that a conflict exists and that there are several ways in which the

10

conflict could be resolved. Not only does the majority refuse to so much as recognize a conflict, it chooses a resolution to this case that it claims, without support, was part of the "compromises that were hammered out" during the enactment of no-fault legislation. See *ante* at 9. But when there are multiple competing interests, as there are here, our job is to examine them in full and choose the result that would best accomplish the Legislature's intent.

It should be evident that the majority's choice elevates one concern—protecting insurers from having to pay claims in a manner the majority deems untimely—over a multitude of other important considerations. Many of the considerations the majority fails to weigh are set forth in Justice Markman's concurrence. In addition, the majority's choice ignores the interests of the insured, whose right to prompt and full recovery was also a paramount consideration in enacting the no-fault scheme and was also part of the "hammered out" compromises. See *Shavers v Attorney General*, 402 Mich 554, 578-579; 267 NW2d 72 (1978) ("The Michigan No-Fault Insurance Act . . . was offered as an innovative social and legal response to the long payment delays, inequitable payment structure, and high legal costs inherent in the tort (or 'fault') liability system. The goal of the no-fault insurance system was to provide victims of motor vehicle accidents assured, adequate, and prompt reparation for certain economic losses."). Further, it entirely ignores the weighty public policy behind the RJA's saving provision, which was crafted to protect the interests of those who cannot act on their own. See *Paavola v St Joseph Hosp Corp*, 119

11

Mich App 10, 14-15; 325 NW2d 609 (1982). As has been repeatedly recognized by this very majority, when a conflict exists, we must choose the interpretation that best effectuates legislative intent. But rather than acknowledge the existence of numerous considerations that could inform this endeavor, the majority asserts that my attempt to do so is an "indefensible position" and my conclusion a function not of statutory interpretation, but of my wanting it to be so. *Ante* at 8-12. As any astute reader can observe, the majority's characterization lacks credibility.

In any event, the majority's analysis falters when one considers the true character of MCL 600.5851(1). By portraying the statute as having a "tolling" function, the majority is misguided into an incorrect conclusion. This is because although it may seem facially rational to conclude that a "tolling" provision cannot "toll" something other than a period of limitations, the one-year-back rule, MCL 600.5851(1), is not a "tolling" provision. It is a statute through which the Legislature granted a "year of grace" to infants and the legally incompetent in recognition of their inability to legally act until their disabilities are removed. *Honig v Liddy*, 199 Mich App 1, 3-4; 500 NW2d 745 (1993).[9] This year of grace

---

[9] Notably, the majority refuses to acknowledge its mischaracterization of the saving provision, insisting on calling it a "tolling" provision. This obstinacy derails the majority's analysis and renders it inaccurate. Perhaps the majority favors this course because recognizing the differences between the design and effect of tolling and saving provisions would require it to actually engage in a straightforward discussion regarding the operation of the saving provision on the one-year-back rule.

acts to "save" a person's claim, not "toll" the period of limitations that applies to the claim. In other words, the saving provision does more than defeat a period of limitations. It preserves the protected person's *claim* and prevents the same from total abrogation.

By refusing to acknowledge that there is a conflict between MCL 500.3145(1) and MCL 600.5851, the majority finds this an open-and-shut case; it holds that because MCL 500.3145(1) does not say otherwise, the one-year-back rule applies to those who might otherwise be protected by MCL 600.5851. This, it asserts, is "plain and unambiguous."[10] The majority's conclusion must be questioned for several reasons. First, MCL 500.3145(1) contains no explicit statement that the one-year-back rule applies in the same manner to persons whose claims are saved under MCL 600.5851(1) as it does to those whose claims are not saved. Nor does the saving provision contain any explicit statement that it saves merely the right to file papers alleging damages, but not the enveloped right to collect those damages. Likewise, there is no indication that, in this context, the right to bring a "claim" does not include the right to sue for all

---

[10] As this Court has astutely observed, "What is 'plain and unambiguous' often depends on one's frame of reference." *Shiffer v Bd of Ed of Gibraltar*, 393 Mich 190, 194; 224 NW2d 255 (1974). The majority's "frame of reference" is its failure to consider the true character of the saving provision and refusal to even attempt to give meaning to the conflicting statute. As such, it concludes that the one-year-back rule plainly and unambiguously disallows minors and incompetents from obtaining a full recovery. My frame of reference encompasses both statutes and their import to one another. Under that frame of reference, a conflict is apparent.

13

damages incurred. Thus, when read in conjunction with MCL 600.5851, as we must, a genuine question arises regarding whether the Legislature viewed the right to recover damages as encompassed within the broader right to bring suit when it crafted the saving provision so that the saving provision would operate to preserve a claim in its entirety. And because reasonable minds can differ with respect to harmonizing these two provisions, their interpretation is open to legitimate debate. Labeling this as "personal preference" is nothing more than a convenient way to dismiss sound legal analysis.

Oddly, the majority chastises me for examining both statutory provisions, apparently preferring to ignore one of them. See *ante* at 8-9. It claims that there is no recognized method of statutory construction that permits considering the effect of these two statutes on one another, both of which we have been asked to interpret, and both of which, to be given any meaning at all, are inextricably intertwined. The saving provision cannot be read alone because, by its very nature, it operates on or in conjunction with other governing statutes. With respect to its denial of our obligation to read the statutes together, the majority's statements are not only befuddling and counterintuitive, but just plain wrong. See *Bailey v Oakwood Hosp & Med Ctr*, 472 Mich 685, 693; 698 NW2d 374 (2005) ("When ascertaining intent, we read differing statutory provisions to produce an harmonious whole."), citing MCL 8.3a; *Farrington v Total Petroleum, Inc*, 442 Mich 201, 208-209, 212; 501 NW2d 76 (1993). See also *Nowell v Titan Ins Co*, 466 Mich 478, 482; 648 NW2d 157 (2002) (listing as one

14

of "the most basic principles of statutory construction" the obligation to attempt to resolve potential statutory conflicts by reading provisions harmoniously); *Murphy v Michigan Bell Tel Co*, 447 Mich 93, 98, 99 n 2; 523 NW2d 310 (1994) ("When different statutes address the same subject, courts must endeavor to read them harmoniously and give them reasonable effect. *House Speaker v State Administrative Bd*, 441 Mich 547, 568; 495 NW2d 539 (1993); *Huron Twp v City Disposal Systems, Inc*, 201 Mich App 210, 212; 505 NW2d 897 (1993).") ("[W]e are required to treat the mandates of § 341 as paramount to sentences in other statutes that appear to be facially inconsistent when taken out of context.") ("'Where one statute deals with a subject in general terms, and another deals with a part of the same subject in a more detailed way, the two should be harmonized if possible; but if there is any conflict, the latter will prevail'"), quoting 2B Singer, Sutherland Statutory Construction (5th ed), § 51.05, p 174.

Considering the two statutes together, then, *as is our job*, we must determine whether the "action" and the "claim" that is saved by MCL 600.5851(1) encompass the right to collect damages. The word "claim" has been discussed by this Court many times over the past century. For instance, in *Allen v Bd of State Auditors*, 122 Mich 324; 81 NW 113 (1899), this Court noted the following definition of the word "claim": "'[A] demand of a right or alleged right; a calling on another for something due or asserted to be due; as, a claim of wages for services.'" *Id.* at 328, citing *Cent Dict.* In *In re Chamberlain's Estate*, 298 Mich 278; 299 NW 82 (1941), this Court explained that "'[t]he word

15

"claims" is "by authorities generally construed as referring to demands of a pecuniary nature and which could have been enforced against the deceased in his lifetime."'" *Id.* at 285, quoting *In re Quinney's Estate*, 287 Mich 329, 333; 283 NW 599 (1939), quoting *Knutsen v Krook*, 111 Minn 352, 357; 127 NW 11 (1910). More recently, in *CAM Constr v Lake Edgewood Condo Ass'n*, 465 Mich 549, 554-555; 640 NW2d 256 (2002), this Court set forth the legal definitions of the term:

> "1. The aggregate of operative facts giving rise to a right enforceable by a court . . . . 2. The assertion of an existing right; any right to payment or to an equitable remedy, even if contingent or provisional . . . . 3. A demand for money or property to which one asserts a right . . . . [Black's Law Dictionary (7th ed).]"

In short, then, a claim means a "demand[] of a pecuniary nature," a "right to payment," and a "demand for money." These definitions suggest that when a minor's or incompetent's "claim" is saved by MCL 600.5851(1), it is that person's demand for monetary relief and right to obtain it that is preserved.

It is worth noting that it would be ironic indeed for the Legislature to have *set a trap* for these particular groups of people and to have disguised the trap as a protective measure. But that is exactly what the majority's holding implies. For when one would choose to rely on the clear promise of the saving provision that one's claim is preserved until one year after the disability is removed, one would come to find that, in certain circumstances, the saving provision has actually *extinguished* the claim, not *saved* it. See n 6 of this opinion.

16

Given the above, I would conclude that when the Legislature enacted the saving provision, it indeed intended to save the whole of the disabled person's claim, not merely a severely devitalized right to bring the claim. Without the saving provision, those who are judicially precluded and deemed incapable of protecting their own legal rights would be denied access to justice, so I find this conclusion unchallenging. Insureds who are of age and possess full mental faculties are, understandably, deemed capable of filing suit within a time frame that would preserve their right to recover all damages owed to them. MCL 500.3145(1). If an insured nonetheless waits to file suit, the Legislature has seen fit to limit the insured's ability to recover damages to the year preceding the lawsuit.[11] *Id.* This is the price that is exacted when an insured, presumably capable of filing suit in a manner that would preserve the entirety of his damages, does not do so.

But when a saving provision prevents the abrogation of a legally disadvantaged person's claim, and when there is a statutorily recognized reason why an insured does not file suit, e.g., infancy or insanity, why that person should be precluded a full recovery in the same manner in which a person who is both culpable for not bringing suit in a timely manner and who is not under a disability is inexplicable and unsupported by the statutory language. Faced with

---

[11] Of course, I do not believe that it is equitable to preclude recovery when the delay in filing suit is caused by an insurer's failure to notify its insured that a claim has been denied. See *Devillers*, *supra* at 594-620 (Cavanagh, J., dissenting).

17

a choice, the majority chooses a prohibitively narrow construction that results in sanctioning persons whom *this Court has deemed unable to file suit*. The Legislature recognized the need for an additional layer of protection for infants and the incompetent and provided one by saving the claims of these persons until they can act unencumbered by their disabilities. Nonetheless, the majority returns infants and the incompetent to the same footing as those not so afflicted, but only under the no-fault act, because the majority believes that only one legitimate construction of these statutes is possible. As difficult as it is for the majority to accept, I would recognize another legitimate construction and choose the one that both avoids abrogating the claims of minors and the legally incompetent and effectuates the Legislature's intent. "[A] contrary holding would constitute unjustifiable tampering with the significant public policy clearly reflected in MCL 600.5851(1)—the protection and preservation of the substantive rights of [minors and] mentally incompetent persons." *Paavola*, *supra at* 14-15 (discussing why the appointment of a guardian does not negate the saving provision).

In addition to the reasons already discussed, I would also give weight to the fact that the latter construction has gone unchanged by the Legislature since *Geiger*, *supra*. Had we drastically misconstrued the Legislature's meaning and created turmoil in the no-fault system by allowing infants and the incompetent their day in court, certainly the Legislature would have seen fit to correct that grave error.

18

The majority's disregard for the rights of the disabled—indeed, the abrogation of their right to the full effect of our judicial system—made manifest by the cursory overruling of 20 years of law, is unjust and immensely sad. And the result discords with the purpose of the legislative protection. Cogent, and what should be obvious, reasons for extending the protections at issue to persons who require them have been recognized by the Legislature and honored for nearly a quarter of a century. So sensible was the reconciliation of the saving provision with the no-fault statute in *Geiger* that defendant itself never challenged it until such a challenge was suggested to defendant at oral argument. But the majority proclaims omnipotent percipience of the legislative intent behind MCL 500.3145(1), while completely disregarding any inquiry into the purpose or function of the saving provision. And for those attentive to this Court's decisions, it should come as no surprise that the majority again chooses to distract the reader from its defective legal analysis by incorrect and unsupportable accusations that those who disagree are merely promoting their own personal agendas.

And so it is that the legislative door to the courthouse—legislatively made wider for those judicially precluded from bringing suit—has today been judicially slammed shut. For these reasons, I respectfully dissent.[12]

---

[12] Further, as Justice Kelly concludes, the majority's result in this case is absurd. One only need peruse Justice Markman's catalog of the absurdities that flow from the majority's analysis to be convinced on this point. Thus, I concur in her conclusion that the majority's analysis fosters intolerably absurd results.

(continued…)

Michael F. Cavanagh

_____

(…continued)

Moreover, I fully concur with Justice Kelly's thorough analysis pertaining to the validity of the "absurd results" doctrine as a tool of statutory construction. While I have always held this view, I take this opportunity to participate in the overdue disavowal of the erroneous repudiation of the "absurd results" doctrine this Court accomplished in *People v McIntire*, 461 Mich 147; 599 NW2d 102 (1999).

STATE OF MICHIGAN

SUPREME COURT

DIANE CAMERON and JAMES
CAMERON, Co-Guardians of the
Estateof Daniel Cameron,

        Plaintiffs-Appellants,

v                                       No. 127018

AUTO CLUB INSURANCE
ASSOCIATION,

        Defendant-Appellee.

_____

WEAVER, J. (*dissenting*).
.

        Daniel Cameron was ten years old when an automobile struck his bicycle, causing a closed head injury. When Daniel was 16 years old, his parents filed suit on his behalf seeking personal protection insurance (PIP) benefits for attendant care given to Daniel in the first three years after his injury. Defendant moved for summary disposition, arguing that plaintiffs' claim was barred by the one-year-back rule in MCL 500.3145(1) of the no-fault automobile insurance act. The trial court denied defendant's motion, granted summary disposition in favor of plaintiffs, and awarded plaintiffs $182,500, an amount stipulated by the parties.

        The Court of Appeals reversed. The majority affirms, holding that under the "one-year-back rule" in MCL 500.3145(1) of the no-fault automobile insurance act, plaintiffs may not recover damages incurred more than one year before they filed suit. The majority further holds that the saving provision in MCL

600.5851(1), which preserves the claims of minors and the insane until one year after the disability is removed, does not apply to the one-year-back rule.

I respectfully dissent from the majority's holding and analysis.[1]  I would hold that the one-year-back rule, MCL 500.3145(1), in the no-fault automobile insurance act does not apply in this case because the tolling provisions found in § 3145(1) are not applicable.  Because the one-year-back rule does not apply, plaintiffs may recover benefits that accrued more than one year before they filed suit.

The majority's analysis and holding are premised on a fundamental misinterpretation of the no-fault act.  MCL 500.3145(1) reads in full:

> An action for recovery of personal protection insurance benefits payable under this chapter for accidental bodily injury may not be commenced later than 1 year after the date of the accident causing the injury unless written notice of injury as provided herein has been given to the insurer within 1 year after the accident or unless the insurer has previously made a payment of personal protection insurance benefits for the injury. If the notice has been given or a payment has been made, the action may be commenced at any time within 1 year after the most recent allowable expense, work loss or survivor's loss has been incurred. *However, the claimant may not recover benefits for any portion of the loss incurred more than 1 year before the date on which the action was commenced.*  The notice of injury required by this subsection may be given to the insurer or any of its authorized agents by a person claiming to be entitled to benefits therefor, or by someone in his behalf.  The notice shall give the name and address of the claimant and indicate in ordinary language the name of the person injured and the time, place and nature of his injury.  [Emphasis added.]

---

[1]  I also agree with Justices Kelly and Markman that this Court should reinstate the "absurd results" rule.  The "absurd results" rule, the commonsense rule that statutes should be construed so as to prevent absurd results, was rejected by this Court in *People v McIntire,* 461 Mich 147; 599 NW2d 102 (1999).

2

The sentence emphasized above, "However, the claimant may not recover benefits for any portion of the loss incurred more than 1 year before the date on which the action was commenced," is the origin of the "one-year-back rule" that is at the heart of the case before us.

The majority treats this sentence, the "one-year-back rule," as a separate limitation on the period for which benefits may be recovered.[2] But this is an incorrect reading of the statute.

There is only *one* period of limitations in § 3145(1): that the action must be brought within one year of the accident. This is stated in the first sentence: "An action for recovery of personal protection insurance benefits payable under this

---

[2] The majority states that the no-fault act contains two limitations on the time for commencing an action and one limitation on the period for which benefits may be recovered:

> "'(1) An action for personal protection insurance [PIP] benefits must be commenced not later than one year after the date of accident, *unless* the insured gives written notice of injury or the insurer previously paid [PIP] benefits for the injury.

> "'(2) If notice has been given or payment has been made, the action may be commenced at any time within one year after the most recent loss was incurred.

> "'(3) Recovery is limited to losses incurred during the one year preceding commencement of the action.'" [*Ante* at (emphasis omitted).]

In making this summary, the majority is quoting from *Devillers v Auto Club Ins Ass'n*, 473 Mich 562, 574; 702 NW2d 539 (2005), which in turn was quoting from *Welton v Carriers Ins Co*, 421 Mich 571, 576; 365 NW2d 170 (1985), overruled on other grounds in *Devillers*.

chapter for accidental bodily injury may not be commenced later than 1 year after the date of the accident causing the injury . . . ."

This statute of limitations in § 3145(1) contains its own tolling provision, also provided in the first sentence of the statute: "unless written notice of injury as provided herein has been given to the insurer within 1 year after the accident or unless the insurer has previously made a payment of personal protection insurance benefits for the injury."  This tolling provision takes effect when one of two things occurs: (1) the insurer is given written notice of the injury within one year of the accident or (2) the insurer has previously paid personal protection insurance benefits for the injury.

The remainder of § 3145(1), the second, third, fourth, and fifth sentences, detail how this tolling provision is to be applied.  The so-called "one-year-back rule" is not a separate limitation on the period for which benefits may be recovered.  Rather, it is an integral part of the tolling rule contained within § 3145(1).  This was the Court of Appeals interpretation of the statute in *Allstate Ins Co v Frankenmuth Mut Ins Co,* 111 Mich App 617; 314 NW2d 711 (1981).

The third sentence of the statute, the one at issue in this case, must be read in context with the other three sentences detailing how the tolling provision is to be applied.  When interpreting a statute, the Court must "consider both the plain meaning of the critical word or phrase as well as 'its placement and purpose in the statutory scheme.'" *Sun Valley Foods Co v Ward,* 460 Mich 230, 237; 596 NW2d

4

119 (1999) (citation omitted).  The second, third, fourth, and fifth sentences of the statute read as follows:

> If the notice has been given or a payment has been made, the action may be commenced at any time within 1 year after the most recent allowable expense, work loss or survivor's loss has been incurred. *However, the claimant may not recover benefits for any portion of the loss incurred more than 1 year before the date on which the action was commenced.*  The notice of injury required by this subsection may be given to the insurer or any of its authorized agents by a person claiming to be entitled to benefits therefor, or by someone in his behalf.  The notice shall give the name and address of the claimant and indicate in ordinary language the name of the person injured and the time, place and nature of his injury. [Emphasis added.]

The use of the word "however" at the beginning of the sentence is significant. "However," when used as a conjunction, means "nevertheless; yet; in spite of that; all the same."  *Webster's New World Dictionary, Second College Edition* (1982). This conjunction, "however," shows an exception to the sentence preceding it, which sets forth when an action may be brought under the tolling provision contained within § 3145(1).[3]  Therefore the exception contained within the "one-year-back rule" takes effect only when the tolling provision is being used.  This Court should overrule the interpretation of the statute given in *Welton, supra,* and followed in *Devillers, supra,* and give meaning to the actual text of the statute.

In determining whether to overrule a prior case, pursuant to the doctrine of stare decisis, this Court should first consider whether the earlier case was wrongly decided.  If it was wrongly decided, the Court should then examine reliance

5

interests: whether the prior decision defies "practical workability"; whether the prior decision has become so embedded, so fundamental to everyone's expectations that to change it would produce not just readjustments, but practical real-world dislocations; whether changes in the law or facts no longer justify the prior decision; and whether the prior decision misread or misconstrued a statute.[4]

Correcting this point of statutory interpretation in *Welton* and *Devillers* would effectively leave the law in its current state. The Court of Appeals has held that the saving provision in § 5851 applies to the no-fault act,[5] and that this saving provision tolls the "one-year-back" rule.[6] Thus, restricting the "one-year-back" rule to apply only when the tolling provision within § 3145(1) is relied on would preserve the status quo, and cause no "practical real-world dislocations."

Because the "one-year-back rule" is an integral part of the tolling provision contained within § 3145(1), it can be applied only as a part of that tolling provision. It cannot be used independently, as a separate limitation on the recovery of benefits. Therefore, the "one-year-back rule" is inapplicable here,

_____

(…continued)

[3] I do not rely on the last antecedent rule, contrary to the majority's hypothesis, *ante* at 16-18.

[4] *Robinson v Detroit,* 462 Mich 439, 464-467; 613 NW2d 307 (2000).

[5] *Rawlins v Aetna Cas & Surety Co*, 92 Mich App 268; 284 NW2d 782 (1979).

[6] *Geiger v Detroit Automobile Inter-Ins Exch*, 114 Mich App 283; 318 NW2d 833 (1982).

6

where the plaintiffs never allege that the tolling provision of § 3145(1) applies.[7]

Plaintiffs instead raised the saving provision in MCL 600.5851(1), which preserves the claims of minors and the insane until one year after the disability is removed, as a defense to the one-year statute of limitations in § 3145(1).

For this reason, I would reverse the decision of the Court of Appeals reversing the trial court's denial of defendant's motion for summary disposition and reinstate the stipulated judgment entered in favor of the plaintiffs.

Elizabeth A. Weaver

---

[7] Defendant moved for summary disposition, arguing that plaintiff's claim was barred by the one-year-back provision of MCL 500.3145(1), consistent with this Court's interpretation of the statute in *Welton, supra*. Although *defendant* asserted that notice was given or payment had previously been made, *plaintiffs* never raised it as a defense to the one-year limitations period in § 3145(1).

7

# S T A T E   O F   M I C H I G A N

## SUPREME COURT

DIANE CAMERON AND JAMES
CAMERON, Co-Guardians of the Estate of
Daniel Cameron,

     Plaintiff-Appellant,

v                       No.     127018

AUTO CLUB INSURANCE
ASSOCIATION,

     Defendant-Appellee.

---

KELLY, J. (*dissenting*).

I concur with Justice Cavanagh's dissent. I write this opinion to point out

that the majority's interpretation creates an absurd result, one that the Court should

not permit. It is absurd to conclude that the Legislature intended to jettison no-

fault claims of children and mentally impaired persons.

I agree also with Justices Markman, Weaver, and Cavanagh that the

"absurd results" rule is an important part of Michigan jurisprudence and should be

reinstated. Four justices believe that the absurd results rule is valid and can be

used in assessing a case. The accuracy of this statement is unaffected by the fact

that only two of them have found an absurd result to have been reached by the majority in this case. *People v McIntire*[1] should be overturned.

## ABSURD RESULTS

The principle that statutes should be construed to avoid absurd results that are manifestly inconsistent with legislative intent is not a new or radical innovation. On the contrary, it was well-established in the jurisprudence of the United States Supreme Court before the twentieth century. In *Church of the Holy Trinity v United States*,[2] the Court unanimously stated:

> It is a familiar rule, that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers. This has been often asserted, and the reports are full of cases illustrating its application. This is not the substitution of the will of the judge for that of the legislator, for frequently words of general meaning are used in a statute, words broad enough to include an act in question, and yet a consideration of the whole legislation, or of the circumstances surrounding its enactment, or of the absurd results which follow from giving such broad meaning to the words, makes it unreasonable to believe that the legislator intended to include the particular act.

Likewise, more recent case law of the United States Supreme Court recognizes that situations exist when it is appropriate to depart from a strictly literal interpretation of statutory language to further legislative intent. For example, in *Lewis v United States,*[3] the Court considered an issue of statutory interpretation involving the federal Assimilative Crimes Act. As the Court

---

[1] 461 Mich 147; 599 NW2d 102 (1999).

[2] 143 US 457, 459; 12 S Ct 511; 36 L Ed 226 (1892).

[3] 523 US 155; 118 S Ct 1135; 140 L Ed 2d 271 (1998).

explained, the basic purpose of this act is to "borrow[]" state law to fill in gaps in federal criminal law applicable to conduct on federal enclaves. *Id.* at 160.

By its literal language, the federal act applies to a defendant's acts or omissions that are not made punishable by "any enactment" of Congress. *Id.* at 159. However, the Court declined to apply the act literally, stating that doing so would not be a "sensible interpretation" because a literal reading of the words "any enactment" would "dramatically separate the statute from its intended purpose." *Id.* at 160.[4]

### THE ABSURD RESULTS EXCEPTION TO THE
### PLAIN LANGUAGE DOCTRINE IN MICHIGAN

The absurd results exception to the plain language doctrine has a long history in Michigan jurisprudence. From 1844 until 1999, this state relied on and regularly used the rule to interpret statutory language that led to absurd results.

In *Alvord v Lent*,[5] Justices Graves, Campbell, and Cooley held that "[i]f [statutory] construction would produce great inconvenience, if it would lead to absurd or mischievous results, if it would tend to embarrass the course of justice and serve to defeat necessary legal remedies, it ought not to be adopted unless required by some positive rule of law, and we are not aware of any such rule." *Id.* at 372. This holding by some of the most highly regarded justices of this Court

---

[4] The Court recognized that an absurd result would be caused by a literal interpretation of the act. It indicated that if the act were read literally, a state law against murder might not be able to be assimilated under the act. This could occur because of the existence of a federal law against assault. *Id.* at 161.

continued the application of the absurd results rule that became part of Michigan law as early as 1844. See *Green v Graves*, 1 Doug 351, 354 (Mich, 1844).

The holding in *Alvord* continued a trend that lasted until 1999. Fourteen years after its decision in *Alvord*, this Court again heard a case raising an absurd results issue. In *Cummings v Corey*,[6] the Court followed the holding in *Alvord,* thus cementing the use of the rule in Michigan. Again, in 1904, the Court cited and followed *Alvord*. See *In re Lambrecht*, 137 Mich 450; 100 NW 606 (1904).

The trend did not end there, and, in fact, the Court has affirmed the application of the absurd results exception repeatedly during the last century. Cases in the 1910s,[7] 1920s,[8] 1930s,[9] 1940s,[10] 1950s,[11] 1960s,[12] 1970s,[13] 1980s,[14]

_____

(…continued)

[5] 23 Mich 369 (1871).

[6] 58 Mich 494; 25 NW 481 (1885).

[7] See *People v Schoenberg,* 161 Mich 88; 125 NW 779 (1910).

[8] See *Attorney General v Detroit U R Co,* 210 Mich 227; 177 NW 726 (1920).

[9] See *Garwols v Bankers Trust Co*, 251 Mich 420, 427-428; 232 NW 239 (1930) quoting *Holy Trinity, supra* at 459.

[10] See *Webster v Rotary Electric Steel Co*, 321 Mich 526; 33 NW2d 69 (1948).

[11] See *State Hwy Comm'r v Detroit City Controller,* 331 Mich 337; 49 NW2d 318 (1951).

[12] See *People v Bailey*, 10 Mich App 636; 160 NW2d 380 (1968).

[13] See *Franges v Gen Motors Corp*, 404 Mich 590; 274 NW2d 392 (1979).

[14] See *Michigan Humane Society v Natural Resources Comm*, 158 Mich App 393; 404 NW2d 757 (1987).

4

and 1990s[15] show its continual use. It was only in 1999 that this Court, in *People v McIntire,* overruled this longstanding part of Michigan law.

In *McIntire*, the Court gave no legal justification for not following Michigan precedent. Instead, it quoted Justice Antonin Scalia stating, "'[We] agree with Justice Scalia's description of such attempts to divine unexpressed and nontextual legislative intent as "nothing but an invitation to judicial lawmaking."'" *McIntire, supra* at 156 n 2, quoting 232 Mich App 71, 122 n 2 (1998) (Young, J., concurring in part and dissenting in part), quoting Scalia, *A Matter of Interpretation: Federal Courts and the Law* (New Jersey: Princeton University Press, 1997), p 21.

Justice Scalia's opinion on the absurd results rule, while perhaps interesting, is not and was not binding on Michigan. Nonetheless, the Court adopted it, and *McIntire* caused a ripple in Michigan law that was not clearly apparent at the time it was decided. However, *McIntire's* effect is now very clear. The damage that it has done and continues to do should be stemmed, and Michigan jurisprudence should be put back on the correct track.[16]

---

[15] See *Karpinski v St John Hosp-Macomb Ctr Corp*, 238 Mich App 539; 606 NW2d 45 (1999).

[16] Recently in *Costa v Community Emergency Med Services, Inc*, 475 Mich 403; 716 NW2d 236 (2006), the Court called into question the continuing relevance of *McIntire* in Michigan by using an absurd-results-type analysis in reaching its decision.

PRESUMPTIVE UNDERSTANDING OF THE
FRAMERS OF THE MICHIGAN CONSTITUTION

A reasonable person must presume that the drafters and ratifiers of our state constitution expected Michigan courts to apply the absurd results rule of construction to Michigan statutes. This is because it was well-established by 1963 that courts should construe statutes to avoid absurd results and at times should depart from a strictly literal application of statutory language. Also, the Michigan Constitution includes no language disapproving this principle. Accordingly, the Court's earlier approval of the principle was consistent with the original intent of the drafters of the state constitution.

Notably, in 1976, a time much closer to the adoption of the current Michigan Constitution than the present, this Court, in a majority opinion joined by six justices, stated: "[It is a] fundamental rule of statutory construction that departure from the literal construction of a statute is justified when such construction would produce an absurd and unjust result and would be clearly inconsistent with the purposes and policies of the act in question." *Salas v Clements,* 399 Mich 103, 109; 247 NW2d 889 (1976).

THE NEARLY UNIVERSAL RECOGNITION OF THE ABSURD
RESULTS RULE OF CONSTRUCTION IN AMERICAN STATES

A review of the case law of our sister states reflects the wide extent to which Michigan has departed from traditional norms of statutory construction. The Arizona Supreme Court has aptly summarized the traditional approach to applying statutory language in American law. It has emphasized that a court

6

should look first to the words of the statute and apply its language if it is unambiguous. But, the Arizona court has counseled, other clear indicators of legislative intent can require a departure from the literal meaning of statutory language that seems unambiguous on its face:

> The primary rule of statutory construction is to find and give effect to legislative intent. We look first to the statute's words. Words have their ordinary meaning unless the context of the statute requires otherwise. Where language is unambiguous, it is normally conclusive, absent a clearly expressed legislative intent to the contrary. [*Mail Boxes Etc, USA v Industrial Comm of Arizona,* 181 Ariz 119, 121; 888 P2d 777 (Ariz, 1995) (citation omitted).]

In addition, prevailing case law from the highest courts of many diverse American states recognizes that courts must construe statutes to avoid absurd results or to further legislative intent. This must occur even if it requires the courts to adopt a construction that departs from a strictly literal reading of statutory language. The states are: Alabama,[17] Alaska,[18] Arkansas,[19] California,[20]

---

[17] See *Ex parte Watley,* 708 So 2d 890, 893 (Ala, 1997), quoting Singer, Sutherland Statutory Construction, § 45.11, p 61 (5th ed) (stating that it is "'fundamental'" that "'departure from the literal construction of a statute is justified when such a construction would produce an absurd and unjust result and would clearly be inconsistent with the purposes and policies of the act in question'").

[18] See *Brooks Range Exploration Co, Inc v Gordon,* 46 P3d 942, 945-946 (Alas, 2002) ("[W]here the literal interpretation of a statute would lead to absurd results, courts can interpret the words of the statute to agree with the intention of the legislature.").

[19] See *Madden v Aldrich,* 346 Ark 405, 412-413; 58 SW3d 342 (2001) ("[S]tatutes will not be given a literal interpretation if it leads to absurd consequences that are clearly contrary to legislative intent.").

Colorado,[21] Delaware,[22] Florida,[23] Hawaii,[24] Idaho,[25] Illinois,[26] Indiana,[27]

Louisiana,[28] Maine,[29] Massachusetts,[30] Minnesota,[31] Missouri,[32] Montana,[33]

_____

(…continued)

[20] See *In re JW,* 29 Cal 4th 200, 210; 126 Cal Rptr 2d 897; 57 P3d 363 (2002) ("[W]e have often said that courts will not give statutory language a literal meaning if doing so would result in absurd consequences that the Legislature could not have intended.").

[21] See *Colorado Dep't of Corrections v Nieto,* 993 P2d 493, 501 (Colo, 2000), quoting *AviComm, Inc v Colorado Pub Utilities Comm,* 955 P2d 1023, 1031 (Colo, 1998) ("'[T]he intention of the legislature will prevail over a literal interpretation of the statute that leads to an absurd result.'").

[22] See *Director of Revenue v CNA Holdings, Inc,* 818 A2d 953, 957 (Del, 2003), quoting *Newtowne Village Service Corp v Newtowne Rd Dev Co, Inc,* 772 A2d 172, 175 (Del, 2001) (indicating that ambiguity in a statute allows for judicial interpretation "'if a literal reading of the statute would lead to an unreasonable or absurd result not contemplated by the legislature'").

[23] See *Joshua v Gainesville,* 768 So 2d 432, 435 (Fla, 2000), quoting *Las Olas Tower Co v Fort Lauderdale,* 742 So 2d 308, 312 (Fla Dist App, 1999) (stating that a rule of statutory construction is that "'a literal interpretation need not be given the language used when to do so would lead to an unreasonable conclusion or defeat legislative intent or result in a manifest incongruity'").

[24] See *State v Guillermo,* 91 Hawaii 307, 316; 983 P2d 819 (1999) (stating that the court may depart from a plain reading of a statute where a literal interpretation would lead to absurd or unjust results).

[25] See *Driver v SI Corp,* 139 Idaho 423, 427; 80 P3d 1024 (2003) ("The plain meaning of a statute therefore will prevail unless clearly expressed legislative intent is contrary or unless plain meaning leads to absurd results.").

[26] See *In re DF,* 208 Ill 2d 223, 230; 802 NE2d 800 (2003) (declining to apply a "plain language or literal reading" of the statutory provision at issue with reference to the principle that a court "is not bound by the literal language of a statute that produces a result inconsistent with clearly expressed legislative intent, or that yields absurd or unjust consequences not contemplated by the legislature").

[27] See *State v Duggan,* 793 NE2d 1034, 1038 (Ind, 2003) (explaining that in examining a statute, "it is often necessary to avoid excessive reliance on a strict literal meaning" and that the legislature "is presumed to have intended the language used in the statute to be applied logically and not to bring about an unjust or absurd result").

Nebraska,[34] Nevada,[35] New Hampshire,[36] New Jersey,[37] New Mexico,[38] New York,[39] North Carolina,[40] North Dakota,[41] Ohio,[42] Oklahoma,[43] Rhode Island,[44]

_____

(…continued)

[28] See *Metro Riverboat Assoc, Inc v Louisiana Gaming Control Bd,* 797 So 2d 656, 662 (La, 2001) (construing statute "to avoid the potential constitutional questions raised by a literal interpretation" and "to avoid the absurd results that would result from such a reading").

[29] See *Guiggey v Great Northern Paper, Inc,* 704 A2d 375, 377 (Me, 1997) (noting that statutory interpretation is controlled by a statute's plain meaning unless the plain meaning leads to absurd results).

[30] See *Commonwealth v Wallace,* 431 Mass 705, 708; 730 NE2d 275 (2000), quoting *Lexington v Town of Bedford,* 378 Mass 562, 570; 393 NE2d 321 (1979) ("'A literal construction of statutory language will not be adopted when such a construction will lead to an absurd and unreasonable conclusion . . . .'").

[31] See *Mutual Service Cas Ins Co v League of Minnesota Cities Ins Trust,* 659 NW2d 755, 762 (Minn, 2003) (recognizing that the court may "disregard the plain language of a statute only where the legislative purpose was clear and the plain meaning would utterly confound that purpose").

[32] See *Lewis v Gibbons,* 80 SW3d 461, 465-466 (Mo, 2002) (stating that statutory construction "is not to be hyper-technical" and declining to apply an interpretation of statutory language that it found to be "inconsistent with the intention of the legislature, unreasonable and absurd").

[33] See *Hiett v Missoula Co Pub Schools,* 317 Mont 95, 104; 75 P3d 341 (2003), quoting *State v Price,* 310 Mont 320, 326; 50 P3d 530 (2002) (noting that the court must "'construe each statute so as to avoid an absurd result'").

[34] See *Premium Farms v Holt Co,* 263 Neb 415, 423-424; 640 NW2d 633 (2002) (stating that "we are guided by the presumption that the Legislature intended a sensible, rather than an absurd, result in enacting the statute" and declining to apply a plain reading of a statutory provision because it did not lead to a "sensible result").

[35] See *Pellegrini v State,* 117 Nev 860, 873-874; 34 P3d 519 (2001) (setting forth principles that "words in a statute will generally be given their plain meaning, unless such a reading violates the spirit of the act" and that "we must construe statutory language to avoid absurd or unreasonable results").

_____

(…continued)

[36] See *Simpson v Young,* ___ NH ___; ___A2d___; 2006 NH LEXIS 63, * 20 (2006) ("We enforce the statute as written, unless it leads to an absurd result, and leave policy decisions to the legislature.")

[37] See *Hubbard v Reed,* 168 NJ 387, 392; 774 A2d 495 (2001), quoting *Turner v First Union Nat'l Bank,* 162 NJ 75, 84; 740 A2d 1081 (1999) ("'[Where a literal interpretation would create a manifestly absurd result, contrary to public policy, the spirit of the law should control.").

[38] See *State v Davis,* 134 NM 172, 175; 74 P3d 1064 (2003) (stating that if "adherence to the literal use of the words would lead to injustice, absurdity or contradiction," then "the statute is to be construed according to its obvious spirit or reason").

[39] See *Desiderio v Ochs,* 100 NY2d 159, 172; 761 NYS2d 576; 791 NE2d 941 (2003) ("Our well-established rules of statutory construction prevent us from looking behind the unambiguous language of a statute unless an absurd result would obtain from its application.") (citation omitted).

[40] See *Frye Regional Med Ctr, Inc v Hunt,* 350 NC 39, 45; 510 SE2d 159 (1999), quoting *Mazda Motors of America, Inc v Southwestern Motors, Inc,* 296 NC 357, 361; 250 SE2d 250 (1979), quoting *State v Barksdale,* 181 NC 621, 625; 107 SE 505 (1921) ("'"[W]here a literal interpretation of the language of a statute will lead to absurd results, or contravene the manifest purpose of the Legislature, as otherwise expressed, the reason and purpose of the law shall control and the strict letter thereof shall be disregarded.'''").

[41] See *Shiek v North Dakota Workers Compensation Bureau,* 634 NW2d 493, 499 (ND, 2001) ("[I]f adherence to the strict letter of the statute would lead to an absurd or ludicrous result, a court may resort to extrinsic aids, such as legislative history, to interpret the statute.").

[42] See *Hubbard v Canton City School Bd of Ed,* 97 Ohio St 3d 451, 453; 780 NE2d 543 (2002) ("Courts give words in a statute their plain and ordinary meaning unless legislative intent indicates a different meaning.").

[43] See *Bishop v Takata Corp,* 12 P3d 459, 466 n 30 (Okla, 2000) ("The plain meaning of statutory language is conclusive except in the rare case in which literal construction will produce a result demonstrably at odds with the intention of the Legislature.").

[44] See *Park v Ford Motor Co,* 844 A2d 687, 692 (RI, 2004), quoting *Providence Journal Co v Rodgers,* 711 A2d 1131, 1134 (RI, 1998) ("We do not '"interpret a legislative enactment literally when to do so would provide a result at odds with its legislative intent."'").

South Carolina,[45] South Dakota,[46] Tennessee,[47] Texas,[48] Utah,[49] Vermont,[50] Virginia,[51] Washington,[52] West Virginia,[53] Wisconsin,[54] and Wyoming.[55]

---

[45] See *Hodges v Rainey,* 341 SC 79, 91; 533 SE2d 578 (2000), quoting *Ray Bell Constr Co, Inc v Greenville Co School Dist,* 331 SC 19, 26; 501 SE2d 725 (1998) (courts will reject ordinary meaning of statutory language, "[h]owever plain," if "to accept it would lead to a result so plainly absurd that it could not possibly have been intended by the Legislature or would defeat the plain legislative intention").

[46] See *Slama v Landmann Jungman Hosp,* 654 NW2d 826, 828 (SD, 2002), quoting *In re Petition of Famous Brands, Inc,* 347 NW2d 882, 885 (SD, 1984) ("'[R]esorting to legislative history is justified only when legislation is ambiguous, or its literal meaning is absurd or unreasonable.'").

[47] See *Heirs of Ellis v Estate of Ellis,* 71 SW3d 705, 712 (Tenn, 2002), quoting *Tennessee Title Co v First Fed S & L Ass'n,* 185 Tenn 145, 154; 203 SW2d 697 (1947) ("[W]here the 'carrying out of the legislative intention, which is the prime and sole object of all rules of construction, can only be accomplished by departure from the literal interpretation of the language employed,' then the legislative intent should be applied over 'the literal import of the words.'").

[48] See *Helena Chemical Co v Wilkins,* 47 SW3d 486, 493 (Tex, 2001) (stating that "[e]ven when a statute is not ambiguous on its face, we can consider other factors to determine the Legislature's intent" and articulating various factors, including the circumstances of the statute's enactment and the legislative history).

[49] See *Jackson v Mateus,* 70 P3d 78, 83 (2003), quoting *Millett v Clark Clinic Corp*, 609 P2d 934, 936 (Utah, 1980) (stating that "[a]n ordinance should be applied according to its literal wording, unless such a reading is unreasonable, confused, inoperable, or in blatant contravention of the express purpose of the statute" and that "'statutory enactments are to be so construed as to render all parts thereof relevant and meaningful, and interpretations are to be avoided which render some part of a provision nonsensical or absurd.'").

[50] See *Town of Killington v State,* 172 Vt 182, 189; 776 A2d 395 (2001) ("When the plain meaning of statutory language appears to undermine the purpose of the statute, we are not confined to a literal interpretation . . . ."). See also *Judicial Watch, Inc v State*, ___ Vt ___; 892 A2d 191, 199 (2005) (standing for the proposition that the absurd results doctrine "does not, however, provide a license to substitute this Court's policy judgments for those of the Legislature" and that it "'should be used sparingly because it entails the risk that the judiciary will displace legislative policy on the basis of speculation that the legislature could

(continued…)

The Iowa Supreme Court has strongly suggested that it would depart from a literal application of statutory language to avoid an absurd result. It stated that it presumes that the legislature intends a reasonable and just result and accordingly "interprets statutes so as to avoid absurd results." *State v Iowa Dist Court for Black Hawk Co,* 616 NW2d 575, 578 (Iowa, 2000). Similarly, the Oregon Supreme Court has noted that "a statute should not be construed 'so as to ascribe to the legislature the intent to produce an unreasonable or absurd result.'" *State v Galligan,* 312 Or 35, 39; 816 P2d 601 (1991), quoting *State v Linthwaite,* 295 Or

_____

(…continued)

not have meant what it unmistakably said'"), quoting 2A Singer, Sutherland's Statutes and Statutory Construction, § 46.07, 199 (6th ed).

[51] See *Shelor Motor Co Inc v Miller,* 261 Va 473, 479; 544 SE2d 345 (2001) ("We must determine the intent of the General Assembly from the words contained in the statute, unless a literal construction of the statute would yield an absurd result.").

[52] See *Fraternal Order of Eagles v Grand Aerie of Fraternal Order of Eagles,* 148 Wash 2d 224, 239; 59 P3d 655 (2002) (stating that the court "will avoid literal reading of a statute which would result in unlikely, absurd, or strained consequences").

[53] See *Taylor-Hurley v Mingo Co Bd of Ed,* 209 W Va 780, 787; 551 SE2d 702 (2001), quoting *State ex rel Frazier v Meadows*, 193 W Va 20, 24; 454 SE2d 65 (1944) (stating a recognition of the need to depart from statutory language "'in exceptional circumstances'" and, accordingly, that courts "'may venture beyond the plain meaning of a statute in the rare instances in which there is a clearly expressed legislative intent to the contrary'" or "'in which a literal application would defeat or thwart the statutory purpose'").

[54] See *Hamilton v Hamilton,* 261 Wis 2d 458, 478; 661 NW2d 832 (2003) (noting that "[o]ne of the few exceptions" to the principle that plain and unambiguous statutory language is applied without further analysis is "that the court will seek to avoid a truly absurd or unreasonable result").

[55] See *Abeyta v State,* 42 P3d 1009, 1012 (Wy, 2002) (stating that the court will not construe a statute in a way that "produces an absurd result").

12

162, 170; 665 P2d 863 (1983). Likewise, the Kentucky Supreme Court has stated that "[t]he words of the statute are to be given their plain meaning unless to do so would constitute an absurd result." *Executive Branch Ethics Comm v Stephens,* 92 SW3d 69, 73 (Ky, 2002).

Interestingly, it appears that the Pennsylvania courts are statutorily bound to construe statutes to avoid absurd results. Hence, they are required to depart from a literal application of a statute that would create an absurd result. See *In re Nomination Papers of Lahr,* 577 Pa 1, 7; 842 A2d 327 (2004), citing 1 Pa Cons Stat 1922(1) (noting that the state Statutory Construction Act requires the courts to "'presume that the General Assembly did not intend a result that is absurd or unreasonable'") (citation omitted).

The Georgia Supreme Court has also demonstrated that it recognizes an absurd results exception to applying "clear" statutory language by stating that, as long as statutory language "is clear and does not lead to an unreasonable or absurd result, 'it is the sole evidence of the ultimate legislative intent.'" *Ray v Barber,* 273 Ga 856; 548 SE2d 283 (2001), quoting *Caminetti v United States,* 242 US 470, 490; 37 S Ct 192; 61 L Ed 442 (1917).

The Connecticut Supreme Court also clearly rejects an approach to statutory construction that would always apply the literal meaning of statute in the following thoughtful explanation of its approach to statutory construction:

> In construing the workers' compensation statutes at issue, we follow the method of statutory interpretation recently articulated in *State v. Courchesne,* 262 Conn. 537 [577-578], 816 A.2d 562 (2003). "The process of statutory interpretation involves a reasoned

13

search for the intention of the legislature. . . .  In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply.  In seeking to determine that meaning, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter. . . .  Thus, this process requires us to consider all relevant sources of the meaning of the language at issue, without having to cross any threshold or thresholds of ambiguity.  Thus, we do not follow the plain meaning rule.

"In performing this task, we begin with a searching examination of the language of the statute, because that is the most important factor to be considered.  In doing so, we attempt to determine its range of plausible meanings and, if possible, narrow that range to those that appear most plausible.  We do not, however, end with the language.  We recognize, further, that the purpose or purposes of the legislation, and the context of the language, broadly understood, are directly relevant to the meaning of the language of the statute."  [*Hatt v Burlington Coat Factory,* 263 Conn 279, 290; 819 A2d 260 (2003).]

In a similar vein, the Kansas Supreme Court has stated that "'[i]n determining legislative intent, courts are not limited to a mere consideration of the language used, but look to the historical background of the enactment, the circumstances attending its passage, the purpose to be accomplished, and the effect the statute may have under the various constructions suggested.'"  *State v Barnes,* 275 Kan 364, 375; 64 P3d 405 (2003), quoting *State v Le,* 260 Kan 845, 849; 926 P2d 638 (1996).

The Maryland Court of Appeals has likewise made clear that it does not regard issues of statutory interpretation always to be controlled by the literal meaning of a statute:

14

> [W]hen there is some question as to whether a literal interpretation of the language used in the statute really would be consistent with the purpose of the legislation, we may look beyond that literal meaning. In such a circumstance, "the court, in seeking to ascertain legislative intent, may consider the consequences resulting from one meaning rather than another, and adopt that construction which avoids an illogical or unreasonable result, or one which is inconsistent with common sense." [*Brown v State,* 359 Md 180, 189; 753 A2d 84 (2000), quoting *Kaczorowski v Mayor of Baltimore,* 309 MD 505, 513; 525 A2d 628 (1987).]

From this discussion, it strongly appears that 48 of the 50 American states adhere to the traditional principle that a court should construe a statute to avoid absurd results. They agree that courts should not follow a rigidly literal approach to statutory construction that is inconsistent with legislative intent.

The remaining state, aside from Michigan, is Mississippi. It appears that Mississippi might not allow a departure from a literal application of a statute even to avoid absurd results or to further legislative intent. My research has found no Mississippi precedent clearly recognizing the traditional absurd results rule of construction, and the Mississippi Supreme Court has stated that if a statute "'is plain and unambiguous there is no room for construction . . . .'" *32 Pit Bulldogs & Other Prop v Prentiss Co,* 808 So 2d 971, 973-974 (Miss, 2002), quoting *Clark v State ex rel Mississippi State Med Ass'n,* 381 So 2d 1046, 1048 (Miss, 1980).

Hence, American jurisdictions overwhelming adhere to the historic principle that statutes should be construed to avoid absurd results even if it means departing from a literal interpretation. This fact certainly calls into question the recent jurisprudence of the Michigan Supreme Court that departs from the state's decades-long position in the mainstream of American jurisprudence on this matter.

15

A rigidly literalist approach that applies the plain language of a statute is drastically at odds with the approach that the United States Supreme Court employs in interpreting federal statutes[56] It is also at odds with the overwhelming majority of American states. Hence, it is curious that recent case law from this Court has departed from the traditional approach of American courts to statutory construction.

It appears that the cause of the change in perspective by this Court is rooted in the personal views of Associate Justice Antonin Scalia of the United States Supreme Court. In *McIntire,* the Michigan Supreme Court adopted as its own the Court of Appeals dissent in that case written by a Michigan Supreme Court justice while he was a member of that Court. In doing so, the Supreme Court rejected the earlier statement of the Court in *Salas v Celements, supra* at 109, that "departure from the literal construction of a statute is justified when such construction would produce an absurd and unjust result and would be clearly inconsistent with the purposes and polices of the act in question." See *McIntire*, *supra* at 156 n 2.

---

[56] This distinction between federal case law and currently prevailing Michigan case law regarding statutory construction is important for Michigan courts at all levels to bear in mind. Holdings of the Michigan Supreme Court require lower Michigan courts to generally adhere to a rigidly literal application of the language of Michigan statutes even if this produces absurd results. However, there are decisions of the United States Supreme Court indicating that it is appropriate to depart from a literal interpretation to avoid absurd results or to further congressional intent. It is axiomatic that these decisions apply when Michigan courts are called on to interpret federal statutes, as sometimes happens.

The stated rationale for rejecting *Salas* was the majority's agreement with Justice Scalia's disdainful treatment of the rule as an attempt "'to divine unexpressed and nontextual legislative intent . . . .'" *Id.,* citing Scalia, *A Matter of Interpretation: Federal Courts and the Law* (New Jersey: Princeton University Press, 1997), p 21. The Court quoted Justice Scalia as opining that such attempts were ""nothing but an invitation to judicial lawmaking."'" *McIntire, supra* at 156 n 2. But the Court offered no explanation why the personal views of Justice Scalia should have prevailed over established Michigan jurisprudence with regard to construing a statute to avoid an absurd result. Neither was consideration given to the principle of stare decisis, which is respect for established precedent.[57]

A brief review of Justice Scalia's book reveals that his views are marked by internal inconsistencies. Justice Scalia's main thesis with regard to statutory construction is that "[t]he text is the law, and it is the text that must be observed." Scalia, *supra* at 22. He asserts that what the legislature meant as opposed to what it actually stated in the language of a statute is immaterial. *Id*. at 22-23. However, Justice Scalia acknowledges that one of the "sound principles of interpretation" is the interpretative doctrine of *lapsus linguae* (slip of the tongue) or "scrivener's error," where from the very face of the statute "it is clear to the reader that a

---

[57] I realize that I signed the opinion in *McIntire*. I have since recognized my mistake and have rejected the views on statutory construction expressed in that opinion. See *Halloran v Bahn*, 470 Mich 572, 588; 683 NW2d 129 (2004) (Kelly, J., dissenting); *Koontz v Ameritech Services, Inc*, 466 Mich 304, 326; 645 NW2d 34 (2002) (Kelly, J., dissenting); *People v Clemens*, 462 Mich 864, 865 (2000) (Kelly, J., dissenting.)

mistake of expression (rather than of legislative wisdom) has been made." *Id.* at 20.

As an example, Justice Scalia refers to a statute stating "defendant" when only "criminal defendant" makes sense. *Id.* I agree that the scrivener's error canon of construction is an appropriate tool in determining legislative intent. But intellectual honesty requires an acknowledgement that it involves a departure from the actual language used by the Legislature or by Congress.

In a similar vein, Justice Scalia defends the use of traditional canons of construction that he states are often associated with textualism, including the canons *expressio unius est exclusio alterius* (expression of one thing implies exclusion of others) and *ejusdem generis* (limiting general language to items of the same sort as contemplated by specific language). *Id.* at 25-27. I certainly believe that traditional canons of construction such as these are not only appropriate, but are often extremely helpful tools in ascertaining legislative intent.

However, it must be acknowledged that they are not typically required by the statutory text itself. Rather, it may be fairly understood that the Legislature expects and intends the judiciary to employ well-established canons of construction in construing statutes. Thus, it cannot reasonably be concluded that using the canons of construction accords with a rigid adherence to applying the text of a law without regard to actual legislative intent.

18

These contradictions in Justice Scalia's judicial philosophy reflect an internal inconsistency seemingly endemic to rigid textualism. As a thoughtful commentator has stated:

> While textualists generally avoid legislative history, they freely consult assorted dictionaries, make use of various linguistic arguments without benefit of linguistic study, and selectively employ canons of statutory interpretation in their textual analyses. The advocates of plain meaning textualism do so without the benefit of any principled methodology justifying these extra-statutory tools. [Cavanaugh, *Order in multiplicity*: *Aristotle on text, context, and the rule of law*, 79 NC L R 577, 595-596 (2001).]

Justice Scalia also acknowledges that the principle that a judge's objective in interpreting a statute is to give effect to the intent of the Legislature "goes back at least as far as Blackstone." Scalia, *supra* at 16 n 15, citing 1 Blackstone, Commentaries on the Laws of England 59-62, 91 (1765). Hence, the principle that courts may depart from a literal interpretation of a statute to effect legislative intent was a recognized facet of the law before our nation was founded.

Accordingly, departure from this historic principle is a remarkably activist position. Indeed, as one commentator has noted, Justice Scalia's views on statutory construction expressed in *A Matter of Interpretation* are extreme. Justice Scalia compares judges who use traditional guides to statutory construction to ascertain legislative intent (other than a rigid adherence to the "plain language" of the statute) to the despotic Roman Emperor Nero.[58]

---

[58] See Cavanaugh, *supra* at 593 n 50 (referring to the relevant language in Scalia's book and noting that "[i]t is important to recognize that for Justice Scalia there appears no distinction between interpretation by judges (elected or not) and

(continued…)

In essence, Justice Scalia and his adherents place their idiosyncratic views on statutory construction above adherence to traditional norms of American jurisprudence. Of course, many aspects of the law must develop over time. Accordingly, it is appropriate occasionally, for example, for courts to alter common-law principles in light of new social realities. However, this is worlds apart from abolishing a bedrock principle of statutory construction such as the rule that a statute should be construed to avoid absurd results inconsistent with legislative intent.

It is also worthy to note, as does Justice Markman, that Justice Scalia himself has at certain times embraced the absurd results rule. See *K mart Corp v Cartier, Inc,* 486 US 281, 324 n 2; 108 S Ct 1811; 100 L Ed 2d 313 (1988) (Scalia, J., concurring in part and dissenting in part). This fact further strengthens my position that this Court should not continue to follow *McIntire,* which rejected the rule.

APPLICATION OF THE ABSURD RESULTS RULE TO THIS CASE

_____

(…continued)

the edicts of tyrants"). In the referenced portion of Justice Scalia's work, he refers to judicial construction of statutes informed by concern for actual legislative intent as "one step worse than the trick the Emperor Nero was said to engage in: posting edicts high up on the pillars, so that they could not easily be read." Scalia, *supra* at 17. Of course, this extreme position does not meaningfully acknowledge that judicial construction of a statute is typically concerned with the details of its application. It differs greatly from imposing an edict in an area in which a citizen would have no reasonable basis for expecting a court decision. Also, constitutional protections can prevent statutes from being interpreted or applied in a way that imposes unforeseen harms on parties.

20

I now return to the case on appeal. The minority saving provision is found in MCL 600.5851(1) of the Revised Judicature Act (RJA). It provides that a person is entitled to defer bringing an action if the person was under 18 years of age or insane at the time the claim accrued. The person, or someone making a claim for the person, has one year after the disability is removed to bring the action, even if the statutory period of limitations has run. The obvious intent of this section of the RJA is to provide minors and the insane with time to bring a cause of action once they are legally capable of bringing it.

MCL 500.3145(1) is the no-fault act's statute of limitations and tolling provision.[59] As Justice Weaver explains, the one-year-back rule is part of the no-fault act's tolling provision and is not applicable in this case. But the majority insists that we apply it, thereby creating a situation in which injured children and the insane may likely be robbed of the benefit of their causes of action. The

---

[59] Section 3145(1) of the no-fault act provides that:

An action for recovery of personal protection insurance benefits payable under this chapter for accidental bodily injury may not be commenced later than 1 year after the date of the accident causing the injury unless written notice of injury as provided herein has been given to the insurer within 1 year after the accident or unless the insurer has previously made a payment of personal protection insurance benefits for the injury. If the notice has been given or a payment has been made, the action may be commenced at any time within 1 year after the most recent allowable expense, work loss or survivor's loss has been incurred. *However, the claimant may not recover benefits for any portion of the loss incurred more than 1 year before the date on which the action was commenced.* [Emphasis added.]

21

ruling assumes that the Legislature intended to grant minors and insane persons a hollow right to bring a no-fault action. It is patently preposterous that any sane legislator intended the law to be construed as it has been construed by the majority in this case. The result reached is absurd.

As this Court has stated on numerous occasions, a result is absurd where it is clearly inconsistent with the purposes and policies of the act in question. *Salas, supra* at 109. See *Attorney General v Detroit U R Co,* 210 Mich 227, 254; 177 NW 726 (1920) (citation omitted) ("'Where the language of a statute, in its ordinary meaning and grammatical construction, leads to a manifest contradiction of the apparent purpose of the enactment, . . . a construction may be put upon it which modifies the meaning of the words, and even the structure of the sentence.'"). I have no serious question but that the result reached by the majority in this case is inconsistent with the intent of the minority/insanity saving provision. It is a manifest contradiction of the apparent purpose of the saving clause, which is to help prevent children and the insane from losing their rightful legal claims.[60]

The intent behind the provision is to provide minors and the insane time to bring an action for injuries they suffered while they were unable to bring it for themselves. Nothing in the statute signals that the Legislature intended to provide

---

[60] I do not advance here a personal policy judgment, as Justice Markman insists. The saving clause was a policy judgment of the Legislature. I do not, as he asserts, define an "absurd result" as one that is "imperfect or flawed" or "less (continued…)

22

such people something less than a complete cause of action. It is inconceivable that the Legislature had a good reason to create a vehicle whereby disadvantaged people could sue later but would have little or no monetary recovery.

For example, assume a nine-year-old boy was injured in an automobile accident and needed seven years to recover. If he brought suit the day he turned 18 and prevailed, he would recover nothing, because he recovered from the accident two years before. Had the Legislature actually intended to treat this person in this way, it would have made it clear. No reasonable legislator would expect the Court to assume such a perverse intent.

Justice Markman suggests that there is no absurd result here because there are "reasonable" reasons why a legislator might have wanted the outcome provided by the majority. The reader can judge for him- or herself whether a legislator would have embraced any of the imagined reasons Justice Markman and Chief Justice Taylor offer.[61]

CONCLUSION

The result that the majority reaches in this case is absurd. It is inconceivable that the Legislature intended to create a hollow cause of action for some of our most helpless and powerless citizens.

_____

(…continued)

'consistent' and 'effective' than it could have been." *Ante* at 15. My definition of "absurd result" is one given by this Court.

[61] What legislator would find it reasonable to reduce the cost of insurance by leaving children and the insane with little or no recovery for their injuries? It is quite unthinkable that a legislator would intentionally vote for a bill that did that.

I believe that the Court should reject *McIntire's* treatment of the absurd results rule. We should reinstate the rule in Michigan and apply it in this case. The idea that the rule is outside of this Court's constitutional authority is indefensible. Throughout all our various constitutions, the people of this state have given this Court its power knowing that, included in it, is the ability to construe statutes to avoid absurd results.

The spirit of the law should control. The absurd results rule should be applied to this case. Since it has not been applied, the result is unjust, absurd, and manifestly contrary to public policy.

Marilyn Kelly